# ROBERTS, ACTING COMMISSIONER, MINNESOTA DEPARTMENT OF HUMAN RIGHTS, ET AL. v. UNITED STATES JAYCEES

No. 83–724.   Argued April 18, 1984—Decided July 3, 1984

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined, and in Parts I and III of which O'CONNOR, J., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 631. REHNQUIST, J., concurred in the judgment. BURGER, C. J., and BLACKMUN, J., took no part in the decision of the case.

*Richard L. Varco, Jr.*, Special Assistant Attorney General of Minnesota, argued the cause for appellants. With him on the briefs were *Hubert H. Humphrey III*, Attorney General, *Kent G. Harbison*, Chief Deputy Attorney General, *Thomas R. Muck*, Deputy Attorney General, and *Richard S. Slowes*, Assistant Attorney General.

*Carl D. Hall, Jr.*, argued the cause for appellee. With him on the brief was *Clay R. Moore.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Robert Abrams*, Attorney General of New York; *Lawrence S. Kahn, Rosemarie Rhodes, Shelley B. Mayer* and *Kim E. Greene*, Assistant Attorneys General, *John K. Van De Kamp*, Attorney General of California, *Andrea Sheridan Ordin*, Chief Assistant Attorney General, and *Marian M. Johnston*, Deputy Attorney General; for the Alliance for Women Membership by *Danielle E. deBenedictis;* for the American Civil Liberties Union et al. by *Laurence H. Tribe, Burt Neuborne, Isabelle Katz*

JUSTICE BRENNAN delivered the opinion of the Court.

This case requires us to address a conflict between a State's efforts to eliminate gender-based discrimination against its citizens and the constitutional freedom of association asserted by members of a private organization. In the decision under review, the Court of Appeals for the Eighth Circuit concluded that, by requiring the United States Jaycees to admit women as full voting members, the Minnesota Human Rights Act violates the First and Fourteenth Amendment rights of the organization's members. We noted probable jurisdiction, *Gomez-Bethke* v. *United States Jaycees*, 464 U. S. 1037 (1984), and now reverse.

## I

## A

The United States Jaycees (Jaycees), founded in 1920 as the Junior Chamber of Commerce, is a nonprofit membership corporation, incorporated in Missouri with national headquarters in Tulsa, Okla. The objective of the Jaycees, as set out in its bylaws, is to pursue

> "such educational and charitable purposes as will promote and foster the growth and development of young men's civic organizations in the United States, designed to inculcate in the individual membership of such organization a spirit of genuine Americanism and civic inter-

*Pinzler, E. Richard Larson,* and *Charles S. Sims;* for Community Business Leaders by *Eldon J. Spencer, Jr.;* for the NAACP Legal Defense and Educational Fund, Inc., by *Jack Greenberg, Beth J. Lief,* and *Judith Reed;* for the National League of Cities et al. by *Lawrence R. Velvel* and *Elaine D. Kaplan;* for the National Organization for Women et al. by *Judith I. Avner* and *Charlotte M. Fischman;* and for Women's Issues Network, Inc., by *Neil H. Cogan.*

Briefs of *amici curiae* urging affirmance were filed for the Boy Scouts of America by *Philip A. Lacovara, Malcolm E. Wheeler, George A. Davidson,* and *David K. Park;* for the Conference of Private Organizations by *Leonard J. Henzke, Jr.;* and for Rotary International by *William P. Sutter* and *Wm. John Kennedy.*

est, and as a supplementary education institution to provide them with opportunity for personal development and achievement and an avenue for intelligent participation by young men in the affairs of their community, state and nation, and to develop true friendship and understanding among young men of all nations." Quoted in Brief for Appellee 2.

The organization's bylaws establish seven classes of membership, including individual or regular members, associate individual members, and local chapters. Regular membership is limited to young men between the ages of 18 and 35, while associate membership is available to individuals or groups ineligible for regular membership, principally women and older men. An associate member, whose dues are somewhat lower than those charged regular members, may not vote, hold local or national office, or participate in certain leadership training and awards programs. The bylaws define a local chapter as "[a]ny young men's organization of good repute existing in any community within the United States, organized for purposes similar to and consistent with those" of the national organization. App. to Juris. Statement A98. The ultimate policymaking authority of the Jaycees rests with an annual national convention, consisting of delegates from each local chapter, with a national president and board of directors. At the time of trial in August 1981, the Jaycees had approximately 295,000 members in 7,400 local chapters affiliated with 51 state organizations. There were at that time about 11,915 associate members. The national organization's executive vice president estimated at trial that women associate members make up about two percent of the Jaycees' total membership. Tr. 56.

New members are recruited to the Jaycees through the local chapters, although the state and national organizations are also actively involved in recruitment through a variety of promotional activities. A new regular member pays an initial fee followed by annual dues; in exchange, he is entitled

to participate in all of the activities of the local, state, and national organizations. The national headquarters employs a staff to develop "program kits" for use by local chapters that are designed to enhance individual development, community development, and members' management skills. These materials include courses in public speaking and personal finances as well as community programs related to charity, sports, and public health. The national office also makes available to members a range of personal products, including travel accessories, casual wear, pins, awards, and other gifts. The programs, products, and other activities of the organization are all regularly featured in publications made available to the membership, including a magazine entitled "Future."

## B

In 1974 and 1975, respectively, the Minneapolis and St. Paul chapters of the Jaycees began admitting women as regular members. Currently, the memberships and boards of directors of both chapters include a substantial proportion of women. As a result, the two chapters have been in violation of the national organization's bylaws for about 10 years. The national organization has imposed a number of sanctions on the Minneapolis and St. Paul chapters for violating the bylaws, including denying their members eligibility for state or national office or awards programs, and refusing to count their membership in computing votes at national conventions.

In December 1978, the president of the national organization advised both chapters that a motion to revoke their charters would be considered at a forthcoming meeting of the national board of directors in Tulsa. Shortly after receiving this notification, members of both chapters filed charges of discrimination with the Minnesota Department of Human Rights. The complaints alleged that the exclusion of women from full membership required by the national organization's bylaws violated the Minnesota Human Rights Act (Act), which provides in part:

"It is an unfair discriminatory practice:

"To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin or sex." Minn. Stat. § 363.03, subd. 3 (1982).

The term "place of public accommodation" is defined in the Act as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." § 363.01, subd. 18.

After an investigation, the Commissioner of the Minnesota Department of Human Rights found probable cause to believe that the sanctions imposed on the local chapters by the national organization violated the statute and ordered that an evidentiary hearing be held before a state hearing examiner. Before that hearing took place, however, the national organization brought suit against various state officials, appellants here, in the United States District Court for the District of Minnesota, seeking declaratory and injunctive relief to prevent enforcement of the Act. The complaint alleged that, by requiring the organization to accept women as regular members, application of the Act would violate the male members' constitutional rights of free speech and association. With the agreement of the parties, the District Court dismissed the suit without prejudice, stating that it could be renewed in the event the state administrative proceeding resulted in a ruling adverse to the Jaycees.

The proceeding before the Minnesota Human Rights Department hearing examiner then went forward and, upon its completion, the examiner filed findings of fact and conclusions of law. The examiner concluded that the Jaycees organization is a "place of public accommodation" within the Act and that it had engaged in an unfair discriminatory practice

by excluding women from regular membership. He ordered the national organization to cease and desist from discriminating against any member or applicant for membership on the basis of sex and from imposing sanctions on any Minnesota affiliate for admitting women. *Minnesota* v. *United States Jaycees*, No. HR–79–014–GB (Minn. Office of Hearing Examiners for the Dept. of Human Rights, Oct. 9, 1979) (hereinafter Report), App. to Juris. Statement A107–A109. The Jaycees then filed a renewed complaint in the District Court, which in turn certified to the Minnesota Supreme Court the question whether the Jaycees organization is a "place of public accommodation" within the meaning of the State's Human Rights Act. See App. 32.

With the record of the administrative hearing before it, the Minnesota Supreme Court answered that question in the affirmative. *United States Jaycees* v. *McClure*, 305 N. W. 2d 764 (1981). Based on the Act's legislative history, the court determined that the statute is applicable to any "public business facility." *Id.*, at 768. It then concluded that the Jaycees organization (a) is a "business" in that it sells goods and extends privileges in exchange for annual membership dues; (b) is a "public" business in that it solicits and recruits dues-paying members based on unselective criteria; and (c) is a public business "facility" in that it conducts its activities at fixed and mobile sites within the State of Minnesota. *Id.*, at 768–774.

Subsequently, the Jaycees amended its complaint in the District Court to add a claim that the Minnesota Supreme Court's interpretation of the Act rendered it unconstitutionally vague and overbroad. The federal suit then proceeded to trial, after which the District Court entered judgment in favor of the state officials. *United States Jaycees* v. *McClure*, 534 F. Supp. 766 (1982). On appeal, a divided Court of Appeals for the Eighth Circuit reversed. *United States Jaycees* v. *McClure*, 709 F. 2d 1560 (1983). The Court of Appeals determined that, because "the advocacy of political

and public causes, selected by the membership, is a not insubstantial part of what [the Jaycees] does," the organization's right to select its members is protected by the freedom of association guaranteed by the First Amendment. *Id.*, at 1570. It further decided that application of the Minnesota statute to the Jaycees' membership policies would produce a "direct and substantial" interference with that freedom, *id.*, at 1572, because it would necessarily result in "some change in the Jaycees' philosophical cast," *id.*, at 1571, and would attach penal sanctions to those responsible for maintaining the policy, *id.*, at 1572. The court concluded that the State's interest in eradicating discrimination is not sufficiently compelling to outweigh this interference with the Jaycees' constitutional rights, because the organization is not wholly "public," *id.*, at 1571–1572, 1573, the state interest had been asserted selectively, *id.*, at 1573, and the antidiscrimination policy could be served in a number of ways less intrusive of First Amendment freedoms, *id.*, at 1573–1574.

Finally, the court held, in the alternative, that the Minnesota statute is vague as construed and applied and therefore unconstitutional under the Due Process Clause of the Fourteenth Amendment. In support of this conclusion, the court relied on a statement in the opinion of the Minnesota Supreme Court suggesting that, unlike the Jaycees, the Kiwanis Club is "private" and therefore not subject to the Act. By failing to provide any criteria that distinguish such "private" organizations from the "public accommodations" covered by the statute, the Court of Appeals reasoned, the Minnesota Supreme Court's interpretation rendered the Act unconstitutionally vague. *Id.*, at 1576–1578.

## II

Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must

be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

The intrinsic and instrumental features of constitutionally protected association may, of course, coincide. In particular, when the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association in both of its forms may be implicated. The Jaycees contend that this is such a case. Still, the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case. We therefore find it useful to consider separately the effect of applying the Minnesota statute to the Jaycees on what could be called its members' freedom of intimate association and their freedom of expressive association.

### A

The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. *E. g., Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture

and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. See, *e. g.*, *Zablocki* v. *Redhail*, 434 U. S. 374, 383–386 (1978); *Moore* v. *East Cleveland*, 431 U. S. 494, 503–504 (1977) (plurality opinion); *Wisconsin* v. *Yoder*, 406 U. S. 205, 232 (1972); *Griswold* v. *Connecticut*, 381 U. S. 479, 482–485 (1965); *Pierce* v. *Society of Sisters, supra*, at 535. See also *Gilmore* v. *City of Montgomery*, 417 U. S. 556, 575 (1974); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 460–462 (1958); *Poe* v. *Ullman*, 367 U. S. 497, 542–545 (1961) (Harlan, J., dissenting). Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty. See, *e. g.*, *Quilloin* v. *Walcott*, 434 U. S. 246, 255 (1978); *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 844 (1977); *Carey* v. *Population Services International*, 431 U. S. 678, 684–686 (1977); *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 639–640 (1974); *Stanley* v. *Illinois*, 405 U. S. 645, 651–652 (1972); *Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969); *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, *e. g.*, *Zablocki* v. *Redhail, supra;* childbirth, *e. g.*, *Carey* v. *Population Services International, supra;* the raising and education of children, *e. g.*, *Smith* v. *Organization of Foster Families, supra;* and cohabitation with one's relatives, *e. g.*, *Moore* v. *East Cleveland, supra.* Family relationships, by their nature, involve

deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. Compare *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967), with *Railway Mail Assn.* v. *Corsi*, 326 U. S. 88, 93–94 (1945).

Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. See generally *Runyon* v. *McCrary*, 427 U. S. 160, 187–189 (1976) (POWELL, J., concurring). We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent. In this case, however, several features of the Jaycees clearly place the organization outside of the category of relationships worthy of this kind of constitutional protection.

The undisputed facts reveal that the local chapters of the Jaycees are large and basically unselective groups. At the time of the state administrative hearing, the Minneapolis chapter had approximately 430 members, while the St. Paul chapter had about 400. Report, App. to Juris. Statement A–99, A–100. Apart from age and sex, neither the national organization nor the local chapters employ any criteria for judging applicants for membership, and new members are routinely recruited and admitted with no inquiry into their backgrounds. See 1 Tr. of State Administrative Hearing 124–132, 135–136, 174–176. In fact, a local officer testified that he could recall no instance in which an applicant had been denied membership on any basis other than age or sex. *Id.*, at 135. Cf. *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431, 438 (1973) (organization whose only selection criterion is race has "no plan or purpose of exclusiveness" that might make it a private club exempt from federal civil rights statute); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 236 (1969) (same); *Daniel* v. *Paul*, 395 U. S. 298, 302 (1969) (same). Furthermore, despite their inability to vote, hold office, or receive certain awards, women affiliated with the Jaycees attend various meetings, participate in selected projects, and engage in many of the organization's social functions. See Tr. 58. Indeed, numerous nonmembers of both genders regularly participate in a substantial portion of activities central to the decision of many members to associate with one another, including many of the organization's various community programs, awards ceremonies, and recruitment meetings. See, *e. g.*, 305 N. W. 2d, at 772; Report, App. to Juris. Statement A102, A103.

In short, the local chapters of the Jaycees are neither small nor selective. Moreover, much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship. Accordingly, we conclude that the Jaycees chapters lack the distinctive characteristics that might afford constitutional protection to the decision of its members to exclude women. We turn

therefore to consider the extent to which application of the Minnesota statute to compel the Jaycees to accept women infringes the group's freedom of expressive association.

B

An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. See, *e. g.*, *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 294 (1981). According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. See, *e. g. Gilmore* v. *City of Montgomery*, 417 U. S., at 575; *Griswold* v. *Connecticut*, 381 U. S., at 482–485; *NAACP* v. *Button*, 371 U. S. 415, 431 (1963); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S., at 462. Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. See, *e. g.*, *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 907–909, 932–933 (1982); *Larson* v. *Valente*, 456 U. S. 228, 244–246 (1982); *In re Primus*, 436 U. S. 412, 426 (1978); *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 231 (1977). In view of the various protected activities in which the Jaycees engages, see *infra*, at 626–627, that right is plainly implicated in this case.

Government actions that may unconstitutionally infringe upon this freedom can take a number of forms. Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, *e. g.*, *Healy* v. *James*, 408 U. S. 169, 180–184 (1972); it may attempt to require disclosure of

the fact of membership in a group seeking anonymity, *e. g.*, *Brown* v. *Socialist Workers '74 Campaign Committee*, 459 U. S. 87, 91–92 (1982); and it may try to interfere with the internal organization or affairs of the group, *e. g.*, *Cousins* v. *Wigoda*, 419 U. S. 477, 487–488 (1975). By requiring the Jaycees to admit women as full voting members, the Minnesota Act works an infringement of the last type. There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate. See *Abood* v. *Detroit Board of Education*, *supra*, at 234–235.

The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms. *E. g.*, *Brown* v. *Socialist Workers '74 Campaign Committee*, *supra*, at 91–92; *Democratic Party of United States* v. *Wisconsin*, 450 U. S. 107, 124 (1981); *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976) *(per curiam); Cousins* v. *Wigoda*, *supra*, at 489; *American Party of Texas* v. *White*, 415 U. S. 767, 780–781 (1974); *NAACP* v. *Button*, *supra*, at 438; *Shelton* v. *Tucker*, 364 U. S. 479, 486, 488 (1960). We are persuaded that Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms.

On its face, the Minnesota Act does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria. See

also *infra*, at 629–631. Nor does the Jaycees contend that the Act has been applied in this case for the purpose of hampering the organization's ability to express its views. Instead, as the Minnesota Supreme Court explained, the Act reflects the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services. See 305 N. W. 2d, at 766–768. That goal, which is unrelated to the suppression of expression, plainly serves compelling state interests of the highest order.

The Minnesota Human Rights Act at issue here is an example of public accommodations laws that were adopted by some States beginning a decade before enactment of their federal counterpart, the Civil Rights Act of 1875, ch. 114, 18 Stat. 335. See Discrimination in Access to Public Places: A Survey of State and Federal Accommodations Laws, 7 N. Y. U. Rev. L. & Soc. Change 215, 238 (1978) (hereinafter NYU Survey). Indeed, when this Court invalidated that federal statute in the *Civil Rights Cases*, 109 U. S. 3 (1883), it emphasized the fact that state laws imposed a variety of equal access obligations on public accommodations. *Id.*, at 19, 25. In response to that decision, many more States, including Minnesota, adopted statutes prohibiting racial discrimination in public accommodations. These laws provided the primary means for protecting the civil rights of historically disadvantaged groups until the Federal Government reentered the field in 1957. See NYU Survey 239; Brief for State of New York et al. as *Amici Curiae* 1. Like many other States, Minnesota has progressively broadened the scope of its public accommodations law in the years since it was first enacted, both with respect to the number and type of covered facilities and with respect to the groups against whom discrimination is forbidden. See 305 N. W. 2d, at 766–768. In 1973, the Minnesota Legislature added discrimination on the basis of sex to the types of conduct prohibited by the statute. Act of May 24, 1973, ch. 729, § 3, 1973 Minn. Laws 2164.

By prohibiting gender discrimination in places of public accommodation, the Minnesota Act protects the State's citizenry from a number of serious social and personal harms. In the context of reviewing state actions under the Equal Protection Clause, this Court has frequently noted that discrimination based on archaic and overbroad assumptions about the relative needs and capacities of the sexes forces individuals to labor under stereotypical notions that often bear no relationship to their actual abilities. It thereby both deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life. See, e. g., *Heckler* v. *Mathews*, 465 U. S. 728, 744–745 (1984); *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 723–726 (1982); *Frontiero* v. *Richardson*, 411 U. S. 677, 684–687 (1973) (plurality opinion). These concerns are strongly implicated with respect to gender discrimination in the allocation of publicly available goods and services. Thus, in upholding Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a, which forbids race discrimination in public accommodations, we emphasized that its "fundamental object . . . was to vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.'" *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 250 (1964). That stigmatizing injury, and the denial of equal opportunities that accompanies it, is surely felt as strongly by persons suffering discrimination on the basis of their sex as by those treated differently because of their race.

Nor is the state interest in assuring equal access limited to the provision of purely tangible goods and services. See *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U. S. 592, 609 (1982). A State enjoys broad authority to create rights of public access on behalf of its citizens. *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 81–88 (1980). Like many States and municipalities, Minnesota has adopted a functional definition of public accommodations that reaches various forms of public, quasi-commercial conduct.

See 305 N. W. 2d, at 768; Brief for National League of Cities et al. as *Amici Curiae* 15–16. This expansive definition reflects a recognition of the changing nature of the American economy and of the importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women. See *Califano* v. *Webster*, 430 U. S. 313, 317 (1977) *(per curiam); Frontiero* v. *Richardson, supra,* at 684–686. Thus, in explaining its conclusion that the Jaycees local chapters are "place[s] of public accommodations" within the meaning of the Act, the Minnesota court noted the various commercial programs and benefits offered to members and stated that "[l]eadership skills are 'goods,' [and] business contacts and employment promotions are 'privileges' and 'advantages' . . . ." 305 N. W. 2d, at 772. Assuring women equal access to such goods, privileges, and advantages clearly furthers compelling state interests.

In applying the Act to the Jaycees, the State has advanced those interests through the least restrictive means of achieving its ends. Indeed, the Jaycees has failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association. See *Hishon* v. *King & Spalding*, 467 U. S. 69, 78 (1984) (law firm "has not shown how its ability to fulfill [protected] function[s] would be inhibited by a requirement that it consider [a woman lawyer] for partnership on her merits"); *id.,* at 81 (POWELL, J., concurring); see also *Buckley* v. *Valeo*, 424 U. S., at 71–74; *American Party of Texas* v. *White*, 415 U. S., at 790. To be sure, as the Court of Appeals noted, a "not insubstantial part" of the Jaycees' activities constitutes protected expression on political, economic, cultural, and social affairs. 709 F. 2d, at 1570. Over the years, the national and local levels of the organization have taken public positions on a number of diverse issues, see *id.,* at 1569–1570; Brief for Appellee 4–5, and members of the Jaycees regularly engage in a variety of

civic, charitable, lobbying, fundraising, and other activities worthy of constitutional protection under the First Amendment, *ibid.*, see, *e. g., Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 632 (1980). There is, however, no basis in the record for concluding that admission of women as full voting members will impede the organization's ability to engage in these protected activities or to disseminate its preferred views. The Act requires no change in the Jaycees' creed of promoting the interests of young men, and it imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members. Cf. *Democratic Party of United States* v. *Wisconsin*, 450 U. S., at 122 (recognizing the right of political parties to "protect themselves 'from intrusion by those with adverse political principles'"). Moreover, the Jaycees already invites women to share the group's views and philosophy and to participate in much of its training and community activities. Accordingly, any claim that admission of women as full voting members will impair a symbolic message conveyed by the very fact that women are not permitted to vote is attenuated at best. Cf. *Spence* v. *Washington*, 418 U. S. 405 (1974); *Griswold* v. *Connecticut*, 381 U. S., at 483.

While acknowledging that "the specific content of most of the resolutions adopted over the years by the Jaycees has nothing to do with sex," 709 F. 2d, at 1571, the Court of Appeals nonetheless entertained the hypothesis that women members might have a different view or agenda with respect to these matters so that, if they are allowed to vote, "some change in the Jaycees' philosophical cast can reasonably be expected," *ibid.* It is similarly arguable that, insofar as the Jaycees is organized to promote the views of young men whatever those views happen to be, admission of women as voting members will change the message communicated by the group's speech because of the gender-based assumptions of the audience. Neither supposition, however, is supported by the record. In claiming that women might have a differ-

ent attitude about such issues as the federal budget, school prayer, voting rights, and foreign relations, see *id.*, at 1570, or that the organization's public positions would have a different effect if the group were not "a purely young men's association," the Jaycees relies solely on unsupported generalizations about the relative interests and perspectives of men and women. See Brief for Appellee 20–22, and n. 3. Although such generalizations may or may not have a statistical basis in fact with respect to particular positions adopted by the Jaycees, we have repeatedly condemned legal decisionmaking that relies uncritically on such assumptions. See, *e. g., Palmore* v. *Sidoti,* 466 U. S. 429, 433–434 (1984); *Heckler* v. *Mathews,* 465 U. S., at 745. In the absence of a showing far more substantial than that attempted by the Jaycees, we decline to indulge in the sexual stereotyping that underlies appellee's contention that, by allowing women to vote, application of the Minnesota Act will change the content or impact of the organization's speech. Compare *Wengler* v. *Druggists Mutual Insurance Co.,* 446 U. S. 142, 151–152 (1980), with *Schlesinger* v. *Ballard,* 419 U. S. 498, 508 (1975).

In any event, even if enforcement of the Act causes some incidental abridgment of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes. As we have explained, acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent— wholly apart from the point of view such conduct may transmit. Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection. *Runyon* v. *McCrary,* 427 U. S., at 175–176. Compare *NAACP* v. *Claiborne Hardware Co.,* 458 U. S., at 907–909 (peaceful picketing), with *id.,* at 916 (violence). In prohibiting such practices, the Minnesota Act

therefore "responds precisely to the substantive problem which legitimately concerns" the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose. See *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 810 (1984).

## III

We turn finally to appellee's contentions that the Minnesota Act, as interpreted by the State's highest court, is unconstitutionally vague and overbroad. The void-for-vagueness doctrine reflects the principle that "a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Constuction Co.*, 269 U. S. 385, 391 (1926). The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review. See, *e. g., Kolender* v. *Lawson*, 461 U. S. 352, 357–358 (1983); *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972); *Giaccio* v. *Pennsylvania*, 382 U. S. 399, 402–404 (1966).

We have little trouble concluding that these concerns are not seriously implicated by the Minnesota Act, either on its face or as construed in this case. In deciding that the Act reaches the Jaycees, the Minnesota Supreme Court used a number of specific and objective criteria—regarding the organization's size, selectivity, commercial nature, and use of public facilities—typically employed in determining the applicability of state and federal antidiscrimination statutes to the membership policies of assertedly private clubs. See, *e. g., Nesmith* v. *Young Men's Christian Assn.*, 397 F. 2d 96

(CA4 1968); *National Organization for Women* v. *Little League Baseball, Inc.*, 127 N. J. Super. 522, 318 A. 2d 33, aff'd mem., 67 N. J. 320, 338 A. 2d 198 (1974). See generally NYU Survey 223–224, 250–252. The Court of Appeals seemingly acknowledged that the Minnesota court's construction of the Act by use of these familiar standards ensures that the reach of the statute is readily ascertainable. It nevertheless concluded that the Minnesota court introduced a constitutionally fatal element of uncertainty into the statute by suggesting that the Kiwanis Club might be sufficiently "private" to be outside the scope of the Act. See 709 F. 2d, at 1577. Like the dissenting judge in the Court of Appeals, however, we read the illustrative reference to the Kiwanis Club, which the record indicates has a formal procedure for choosing members on the basis of specific and selective criteria, as simply providing a further refinement of the standards used to determine whether an organization is "public" or "private." See *id.*, at 1582 (Lay, C. J., dissenting). By offering this counter-example, the Minnesota Supreme Court's opinion provided the statute with more, rather than less, definite content.

The contrast between the Jaycees and the Kiwanis Club drawn by the Minnesota court also disposes of appellee's contention that the Act is unconstitutionally overbroad. The Jaycees argues that the statute is "susceptible of sweeping and improper application," *NAACP* v. *Button*, 371 U. S., at 433, because it could be used to restrict the membership decisions of wholly private groups organized for a wide variety of political, religious, cultural, or social purposes. Without considering the extent to which such groups may be entitled to constitutional protection from the operation of the Minnesota Act, we need only note that the Minnesota Supreme Court expressly rejected the contention that the Jaycees should "be viewed analogously to private organizations such as the Kiwanis International Organization." 305 N. W. 2d, at 771. The state court's articulated willingness to adopt

limiting constructions that would exclude private groups from the statute's reach, together with the commonly used and sufficiently precise standards it employed to determine that the Jaycees is not such a group, establish that the Act, as currently construed, does not create an unacceptable risk of application to a substantial amount of protected conduct. Cf. *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 216–217 (1975); *NAACP* v. *Button, supra,* at 434. See *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982).

## IV

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE REHNQUIST concurs in the judgment.

THE CHIEF JUSTICE and JUSTICE BLACKMUN took no part in the decision of this case.

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I join Parts I and III of the Court's opinion, which set out the facts and reject the vagueness and overbreadth challenges to the Minnesota statute. With respect to Part II–A of the Court's opinion, I agree with the Court that the Jaycees cannot claim a right of association deriving from this Court's cases concerning "marriage, procreation, contraception, family relationships, and child rearing and education." *Paul* v. *Davis*, 424 U. S. 693, 713 (1976). Those cases, "while defying categorical description," *ibid.*, identify certain zones of privacy in which certain personal relationships or decisions are protected from government interference. Whatever the precise scope of the rights recognized in such cases, they do not encompass associational rights of a 295,000-member organization whose activities are not "private" in any meaningful sense of that term.

I part company with the Court over its First Amendment analysis in Part II–B of its opinion. I agree with the Court that application of the Minnesota law to the Jaycees does not contravene the First Amendment, but I reach that conclusion for reasons distinct from those offered by the Court. I believe the Court has adopted a test that unadvisedly casts doubt on the power of States to pursue the profoundly important goal of ensuring nondiscriminatory access to commercial opportunities in our society. At the same time, the Court has adopted an approach to the general problem presented by this case that accords insufficient protection to expressive associations and places inappropriate burdens on groups claiming the protection of the First Amendment.

## I

The Court analyzes Minnesota's attempt to regulate the Jaycees' membership using a test that I find both overprotective of activities undeserving of constitutional shelter and underprotective of important First Amendment concerns. The Court declares that the Jaycees' right of association depends on the organization's making a "substantial" showing that the admission of unwelcome members "will change the message communicated by the group's speech." See *ante,* at 626–628. I am not sure what showing the Court thinks would satisfy its requirement of proof of a membership-message connection, but whatever it means, the focus on such a connection is objectionable.

Imposing such a requirement, especially in the context of the balancing-of-interests test articulated by the Court, raises the possibility that certain commercial associations, by engaging occasionally in certain kinds of expressive activities, might improperly gain protection for discrimination. The Court's focus raises other problems as well. How are we to analyze the First Amendment associational claims of an organization that invokes its right, settled by the Court in

*NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–466 (1958), to protect the privacy of its membership? And would the Court's analysis of this case be different if, for example, the Jaycees membership had a steady history of opposing public issues thought (by the Court) to be favored by women? It might seem easy to conclude, in the latter case, that the admission of women to the Jaycees' ranks would affect the content of the organization's message, but I do not believe that should change the outcome of this case. Whether an association is or is not constitutionally protected in the selection of its membership should not depend on what the association says or why its members say it.

The Court's readiness to inquire into the connection between membership and message reveals a more fundamental flaw in its analysis. The Court pursues this inquiry as part of its mechanical application of a "compelling interest" test, under which the Court weighs the interests of the State of Minnesota in ending gender discrimination against the Jaycees' First Amendment right of association. The Court entirely neglects to establish at the threshold that the Jaycees is an association whose activities or purposes should engage the strong protections that the First Amendment extends to expressive associations.

On the one hand, an association engaged exclusively in protected expression enjoys First Amendment protection of both the content of its message and the choice of its members. Protection of the message itself is judged by the same standards as protection of speech by an individual. Protection of the association's right to define its membership derives from the recognition that the formation of an expressive association is the creation of a voice, and the selection of members is the definition of that voice. "In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue." *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 784–785 (1978); *Police Dept. of Chicago* v. *Mosley,* 408

U. S. 92, 96 (1972). A ban on specific group voices on public affairs violates the most basic guarantee of the First Amendment—that citizens, not the government, control the content of public discussion.

On the other hand, there is only minimal constitutional protection of the freedom of *commercial* association. There are, of course, some constitutional protections of commercial speech—speech intended and used to promote a commercial transaction with the speaker. But the State is free to impose any rational regulation on the commercial transaction itself. The Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State. A shopkeeper has no constitutional right to deal only with persons of one sex.

The dichotomy between rights of commercial association and rights of expressive association is also found in the more limited constitutional protections accorded an association's recruitment and solicitation activities and other dealings with its members and the public. Reasonable, content-neutral state regulation of the time, place, and manner of an organization's relations with its members or with the State can pass constitutional muster, but only if the regulation is "narrowly drawn" to serve a "sufficiently strong, subordinating interest" "without unnecessarily interfering with First Amendment freedoms." *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 636–637 (1980); see *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 960–961 (1984). Thus, after careful scrutiny, we have upheld regulations on matters such as the financial dealings between an association and its members, see *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976), disclosure of membership lists to the State, see *NAACP* v. *Alabama, supra,* at 463; *Shelton* v. *Tucker*, 364 U. S. 479, 486 (1960), access to the ballot, time limits on registering before elections, and similar matters, see, *e. g., Rosario* v. *Rockefeller*, 410 U. S. 752 (1973); *Dunn*

v. *Blumstein*, 405 U. S. 330 (1972); *Bullock* v. *Carter*, 405 U. S. 134 (1972); *Jenness* v. *Fortson*, 403 U. S. 431 (1971); *Williams* v. *Rhodes*, 393 U. S. 23 (1968). See also *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 649 (1981). By contrast, an organization engaged in commercial activity enjoys only minimal constitutional protection of its recruitment, training, and solicitation activities. While the Court has acknowledged a First Amendment right to engage in nondeceptive commercial advertising, governmental regulation of the commercial recruitment of new members, stockholders, customers, or employees is valid if rationally related to the government's ends.

Many associations cannot readily be described as purely expressive or purely commercial. No association is likely ever to be exclusively engaged in expressive activities, if only because it will collect dues from its members or purchase printing materials or rent lecture halls or serve coffee and cakes at its meetings. And innumerable commercial associations also engage in some incidental protected speech or advocacy. The standard for deciding just how much of an association's involvement in commercial activity is enough to suspend the association's First Amendment right to control its membership cannot, therefore, be articulated with simple precision. Clearly the standard must accept the reality that even the most expressive of associations is likely to touch, in some way or other, matters of commerce. The standard must nevertheless give substance to the ideal of complete protection for purely expressive association, even while it readily permits state regulation of commercial affairs.

In my view, an association should be characterized as commercial, and therefore subject to rationally related state regulation of its membership and other associational activities, when, and only when, the association's activities are not predominantly of the type protected by the First Amendment. It is only when the association is predominantly engaged in protected expression that state regulation of its

membership will necessarily affect, change, dilute, or silence one collective voice that would otherwise be heard. An association must choose its market. Once it enters the marketplace of commerce in any substantial degree it loses the complete control over its membership that it would otherwise enjoy if it confined its affairs to the marketplace of ideas.

Determining whether an association's activity is predominantly protected expression will often be difficult, if only because a broad range of activities can be expressive. It is easy enough to identify expressive words or conduct that are strident, contentious, or divisive, but protected expression may also take the form of quiet persuasion, inculcation of traditional values, instruction of the young, and community service. Cf. *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923). The purposes of an association, and the purposes of its members in adhering to it, are doubtless relevant in determining whether the association is primarily engaged in protected expression. Lawyering to advance social goals may be speech, *NAACP* v. *Button*, 371 U. S. 415, 429–430 (1963), but ordinary commercial law practice is not, see *Hishon* v. *King & Spalding*, 467 U. S. 69 (1984). A group boycott or refusal to deal for political purposes may be speech, *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 912–915 (1982), though a similar boycott for purposes of maintaining a cartel is not. Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement.*

---

*See, e. g., Girl Scouts of the U. S. A., You Make the Difference (1980); W. Hillcourt, The Official Boy Scout Handbook (1979); P. Fussell, The Boy Scout Handbook and Other Observations 7–8 (1982) (*"The Official Boy Scout Handbook*, for all its focus on Axmanship, Backpacking, Cooking, First Aid, Flowers, Hiking, Map and Compass, Semaphore, Trees, and Weather, is another book about goodness. No home, and certainly no government office, should be without a copy").

The considerations that may enter into the determination of when a particular association of persons is predominantly engaged in expression are therefore fluid and somewhat uncertain. But the Court has recognized the need to draw similar lines in the past. Two examples, both addressed in cases decided this Term, stand out.

The first concerns claims of First Amendment protection made by lawyers. On the one hand, some lawyering activity is undoubtedly protected by the First Amendment. "[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *In re Primus*, 436 U. S. 412, 426 (1978); see *NAACP* v. *Button, supra,* at 429–430. On the other hand, ordinary law practice for commercial ends has never been given special First Amendment protection. "A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns." *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 459 (1978). We emphasized this point only this Term in *Hishon* v. *King & Spalding, supra,* where we readily rejected a large commercial law firm's claim to First Amendment protection for alleged gender-based discriminatory partnership decisions for associates of the firm. We found no need to inquire into any connection between gender as a condition of partnership and the speech of the law firm, and we undertook no weighing of "compelling" state interests against the speech interests of the law firm. As a commercial enterprise, the law firm could claim no First Amendment immunity from employment discrimination laws, and that result would not have been altered by a showing that the firm engaged even in a substantial amount of activity entitled to First Amendment protection.

We have adopted a similar analysis in our cases concerning association with a labor union. A State is free to impose rational regulation of the membership of a labor union representing "the general *business* needs of employees." *Rail-*

*way Mail Assn.* v. *Corsi,* 326 U. S. 88, 94 (1945) (emphasis added). The State may not, on the other hand, compel association with a union engaged in ideological activities. *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 236 (1977). The Court has thus ruled that a State may compel association for the commercial purposes of engaging in collective bargaining, administering labor contracts, and adjusting employment-related grievances, but it may not infringe on associational rights involving ideological or political associations. *Ibid.* We applied this distinction in *Ellis* v. *Railway Clerks,* 466 U. S. 435 (1984), decided this Term. Again, the constitutional inquiry is not qualified by any analysis of governmental interests and does not turn on an individual's ability to establish disagreement with the particular views promulgated by the union. It is enough if the individual simply expresses unwillingness to be associated with the union's ideological activities.

In summary, this Court's case law recognizes radically different constitutional protections for expressive and nonexpressive associations. The First Amendment is offended by direct state control of the membership of a private organization engaged exclusively in protected expressive activity, but no First Amendment interest stands in the way of a State's rational regulation of economic transactions by or within a commercial association. The proper approach to analysis of First Amendment claims of associational freedom is, therefore, to distinguish nonexpressive from expressive associations and to recognize that the former lack the full constitutional protections possessed by the latter.

## II

Minnesota's attempt to regulate the membership of the Jaycees chapters operating in that State presents a relatively easy case for application of the expressive-commercial dichotomy. Both the Minnesota Supreme Court and the United States District Court, which expressly adopted the state

court's findings, made findings of fact concerning the commercial nature of the Jaycees' activities. The Court of Appeals, which disagreed with the District Court over the legal conclusions to be drawn from the facts, did not dispute any of those findings. *United States Jaycees* v. *McClure*, 709 F. 2d 1560 (CA8 1983). "The Jaycees is not a political party, or even primarily a political pressure group, but the advocacy of political and public causes, selected by the membership, is a not insubstantial part of what it does. . . . [A] good deal of what the [Jaycees] does indisputably comes within the right of association . . . in pursuance of the specific ends of speech, writing, belief, and assembly for redress of grievances." *Id.*, at 1570.

There is no reason to question the accuracy of this characterization. Notwithstanding its protected expressive activities, the Jaycees—otherwise known as the Junior Chamber of Commerce—is, first and foremost, an organization that, at both the national and local levels, promotes and practices the art of solicitation and management. The organization claims that the training it offers its members gives them an advantage in business, and business firms do indeed sometimes pay the dues of individual memberships for their employees. Jaycees members hone their solicitation and management skills, under the direction and supervision of the organization, primarily through their active recruitment of new members. "One of the major activities of the Jaycees is the sale of memberships in the organization. It encourages continuous recruitment of members with the expressed goal of increasing membership . . . . The Jaycees itself refers to its members as customers and membership as a product it is selling. More than 80 percent of the national officers' time is dedicated to recruitment, and more than half of the available achievement awards are in part conditioned on achievement in recruitment." *United States Jaycees* v. *McClure*, 534 F. Supp. 766, 769 (Minn. 1982). The organization encourages record-breaking performance in selling memberships: the

current records are 348 for most memberships sold in a year by one person, 134 for most sold in a month, and 1,586 for most sold in a lifetime.

Recruitment and selling are commercial activities, even when conducted for training rather than for profit. The "not insubstantial" volume of protected Jaycees activity found by the Court of Appeals is simply not enough to preclude state regulation of the Jaycees' commercial activities. The State of Minnesota has a legitimate interest in ensuring nondiscriminatory access to the commercial opportunity presented by membership in the Jaycees. The members of the Jaycees may not claim constitutional immunity from Minnesota's antidiscrimination law by seeking to exercise their First Amendment rights through this commercial organization.

For these reasons, I agree with the Court that the Jaycees' First Amendment challenge to the application of Minnesota's public accommodations law is meritless. I therefore concur in Parts I and III of the Court's opinion and in the judgment.