**GREATER NEW YORK HEALTH CARE FACILITIES ASSOCIATION, INC., Individually and on Behalf of all of its members, Bartholomew J. Lawson, Flushing Manor Nursing Home, and Rego Park Nursing Home, Plaintiffs,**

v.

**David AXELROD, M.D., Individually, and as Commissioner of the New York State Department of Health, and Mario Cuomo, Individually, and as Governor of the State of New York, Defendants.**

No. 87 Civ. 8086(PNL).

United States District Court, S.D. New York.

July 22, 1991.

---

**3.** This Court does not believe that the deficiencies in the complaint can be rectified by amendment.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiffs, an association of proprietary (for profit) residential health care facilities ("nursing homes"), its executive director, and two individual proprietary nursing homes, challenge the constitutionality of certain policy memoranda of the New York State Department of Health ("DOH") that limit the activities of volunteers in proprietary nursing homes. The parties cross-move for summary judgment.

### Background

Defendant David Axelrod is the Commissioner of the New York State Department of Health, which regulates the operation of nursing homes in the state. On or about September 19, 1969, the DOH issued Department of Health Memorandum ("DOHM") 69–25, captioned "Use of Volunteers in Nursing Homes." While recognizing the valuable contribution of "adequately trained and supervised" volunteers, DOHM 69–25 stated that volunteers could not "provide direct patient care or other services which are the responsibilities of the staff of the nursing home." DOHM 69–25 listed a variety of activities that would be appropriate for volunteers, such as reading to patients or assisting patients in recreational activities. DOHM 69–25 summarized the guidelines for volunteers as follows:

> In general, volunteers may be used to assist with services designed to contribute to the mental, social and emotional well being of patients in ways which supplement, but do not replace, the regular job responsibilities of nursing home personnel.

In 1979, the DOH conducted a study of staffing patterns in nursing homes, including the use of volunteers. In connection with the study, Robert Beattie, Assistant Director of the Bureau of Long Term Care Services of the DOH, wrote a letter on October 1, 1979 to the New York State Department of Labor, inquiring whether minimum wage laws permitted the use of volunteers in proprietary facilities. Beattie was apparently concerned that the minimum wage law would not permit volunteers to work at proprietary (for profit), as opposed to not-for-profit, nursing homes. Defendants cite the provision of the minimum wage law that excludes from its coverage

> any individual who is employed or permitted to work ... (f) as a volunteer ... by a corporation, unincorporated association, community chest, fund or foundation organized and operated exclusively for religious, charitable or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual....

N.Y.Lab.Law § 651(5).

By letter of October 16, 1979, Joseph Armer, Director of the Division of Labor Standards of the Department of Labor responded. Armer's letter stated that while the minimum wage laws did not explicitly permit volunteers to work in proprietary nursing homes, the Division would not apply the laws to prohibit volunteers from serving individual patients by performing limited tasks that were "not directly the work of hospital personnel."[1] If the volunteers performed other kinds of tasks, Armer warned, the nursing homes could be subject to civil and criminal penalties under state and federal law. A year later, Beattie sought clarification as to whether minimum wage laws would allow volunteers to feed patients in proprietary nursing home facilities. By letter of October 23, 1980,

---

1. In relevant part the letter states:

    According to the law volunteers are not specifically permitted to work in proprietary facilities. However the Division of Labor Standards will not apply minimum wage provisions to volunteers in proprietary nursing homes whose services are confined solely to individual patients in selected tasks that are not directly the work of hospital personnel. Such tasks may include:

    reading to patients; writing letters; purchasing or borrowing books, magazines or newspapers; serving as a messenger for patients in the hospital.

Armer responded that he believed the law would not allow volunteers to feed patients:

In my view, feeding patients does not fall within the permitted exceptions outlined in my October 16, 1979 letter. Accordingly, the use of volunteers to feed patients in proprietary facilities would create a minimum wage responsibility under the New York State Labor Law and possibly under the Federal Fair Labor Standards Act.

On November 24, 1982 the DOH issued DOHM 82–72, captioned "Volunteer Feeding of Patients/Residents in Residential Health Care Facilities." DOHM 82–72 stated that the DOH was modifying DOHM 69–25 to allow volunteers to assist with feeding patients in voluntary and public nursing homes. As to proprietary nursing homes, however, DOHM 82–72 stated that in view of minimum wage law concerns, the prohibition on volunteers' feeding patients would remain in place.

By letter of December 27, 1982 and subsequent correspondence, plaintiff Greater New York Health Care Facilities Association, Inc. ("GNYHC") requested that DOH amend DOHM 82–72 to allow volunteers to assist with feeding patients in proprietary facilities. The DOH refused, adhering to its understanding of the New York minimum wage law.

On November 13, 1987, plaintiffs commenced this action, alleging causes of action under 42 U.S.C. § 1983. Plaintiffs allege that DOHM 69–25 and DOHM 82–72 violate constitutionally protected rights, including privacy and freedom of association. Plaintiffs also claim that DOHM 82–72's distinction between proprietary and not-for-profit facilities violates the equal protection clause of the fourteenth amendment. Plaintiffs seek a declaratory judgment that the memoranda are invalid and an injunction preventing their enforcement.

The parties cross-move for summary judgment.

## Discussion

### A. *Standing*

Defendants contend that although the regulations do apply to conduct of the plaintiffs, the rights that the plaintiffs assert in challenging the regulations are those of nursing home patients and volunteers, rather than of the institutions. Therefore, defendants argue, plaintiffs lack standing to bring this action.

In response, plaintiffs offer the declaration of plaintiff Lawson, the executive director of the GNYHC, that he would like to volunteer in nursing homes and is prevented by the regulations from doing so. Plaintiffs also argue that they have third-party standing to assert the rights of patients.

As the court concludes that plaintiffs' challenge to the regulations fails, the court assumes without deciding that plaintiffs have standing to assert all the claims they seek to advance. The court's disposition of this action will, of course, not preclude patients (or other non-parties) from bringing their own challenges to the regulations.

### B. *Restriction of Volunteer Activities*

DOHM 69–25 set forth various restrictions on the activities of nursing home volunteers. These restrictions were reaffirmed by DOHM 82–72, except that this later memorandum allowed volunteers in public or voluntary nursing homes to assist in feeding patients. Plaintiffs challenge the restriction of volunteer activities on a variety of constitutional grounds.

#### 1. Freedom of Association

■ Plaintiffs allege that the regulations violate rights to freedom of association by not allowing patients to have family members or other volunteers assist in basic tasks, such as bathing and dressing.

Defendants insist that the regulations have never been interpreted to apply to family members and proffer an internal DOH memorandum issued on December 27, 1982, shortly after the issuance of DOHM 82–72, that explicitly stated that family members were not included in the category of volunteers.

Plaintiffs claim that this internal document was not publicly distributed and that DOHM 82–72 has thus had the effect of

preventing family members from assisting patients. Plaintiffs, however, have not come forward with any evidence that the regulations have caused any particular patient to be denied the assistance of a family member. Further, plaintiffs have not produced any evidence to rebut defendants' assertion that the restrictions have never been applied to family members and will not be so applied in the future.

In light of the unrebutted evidence that the regulations do not restrict the activities of patients' family members, I decline to consider plaintiffs' claims that the regulations would be unconstitutional if so interpreted.

As for non-family members, to whom the regulations do apply, it is true, as the parties agree, that freedom of association extends beyond familial relationships. *See Roberts v. United States Jaycees*, 468 U.S. 609, 619–620, 104 S.Ct. 3244, 3250–51, 82 L.Ed.2d 462 (1984). In *Jaycees*, the Court noted two kinds of associational interests that merited constitutional protection, intimate association and expressive association. *Id.* at 617–18, 104 S.Ct. at 3249. As plaintiffs allege no interference with rights of expression, only freedom of intimate association is relevant to this action.

In *Jaycees*, the Court stated that the Constitution protected "certain kinds of highly personal relationships" from "unjustified interference by the State." *Id.* at 618, 104 S.Ct. at 3250. The Court discussed the protection of intimate relationships as follows:

> Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference

> therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

*Id.* at 618–19, 104 S.Ct. at 3250 (citations omitted). The Court explained that family relationships stood at the center of this constitutional protection, noting the kinds of activities that had previously been found to be protected, such as marriage, childbirth, raising and educating children, and living with relatives. *Id.* The Court suggested that other kinds of affiliations would also deserve protection if similar in nature to familial ties. The qualities of a particular association would determine how much protection from state regulation it received. The Court commented that "the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees." *Id.* at 620, 104 S.Ct. at 3250. In each case, it is necessary to determine where a particular relationship's "objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.*

Here, plaintiffs assert that patients have a constitutionally protected right to choose some of the individuals who will assist them in personal tasks, such as bathing and dressing. In evaluating this claim, it is important to keep in mind the definition of the functions prohibited to volunteers. By the terms of DOHM 69–25, volunteers may not "provide direct patient care or other services which are the responsibilities of the staff of the nursing home." Thus, the activities at issue are those that are routinely performed by the nursing home's professional staff. Though these activities may be quite personal and include close bodily contact, the conclusion is inescapable that the relationship involved is not the sort of intimate association that merits the kind of constitutional protection that plaintiffs seek. In the setting of the nursing home, a patient will normally have little control over who will be performing these tasks. The patient's desire to have certain non-family members occasionally undertake activities usually performed by staff

does not warrant constitutional protection against the state's interest in having the activities performed by professionals, rather than volunteers.

Patients certainly do not lose their freedom of association when they enter a nursing home; nor, however, do they retain the level of control over their care-givers that they enjoyed at home. The association between nursing home patients and volunteers is not the continuing, intimate affiliation accorded constitutional protection under the principles of *Jaycees.*

### 2. Bodily Integrity

Plaintiffs claim that by restricting the patient's choice as to who can perform intimate tasks, such as bathing and dressing, the regulations violate the constitutional right of bodily integrity.

█ The Constitution does provide protection against unwanted bodily intrusion. *See, e.g., Cruzan v. Director, Missouri Dep't of Health,* —— U.S. ——, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (right to refuse unwanted medical treatment); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (protection against forced stomach pumping). The regulations here, however, do not implicate that constitutional protection. A patient in a state-regulated hospital may have a right to ignore a doctor's advice and refuse medically required surgery. The patient does not, though, have a right to decide that the operation will be performed by an untrained friend, rather than by a licensed surgeon. Nor does the freedom of bodily integrity give a patient in a nursing home the right to insist that personal tasks will sometimes be performed by volunteers, rather than by professional staff.

### 3. Free Exercise of Religion

In their complaint, plaintiffs allege that the regulations embodied in DOHM 69–25 and DOHM 82–72

do[ ] violence to the constitutionally guaranteed Right of Freedom of Religion, by preventing plaintiffs, nursing home patients, relatives, friends, and other persons, from observing such fundamental Biblical commandmants as, Honoring one's father and mother, and Loving one's brother as thyself.

Complaint ¶ 27.

█ Plaintiffs have produced no evidence that any particular individuals believe that their freedom to practice their religion is infringed by the DOH regulations. In any event, the law is clear that so minimal an infringement on religious practice as alleged by plaintiffs will not invalidate otherwise valid, facially neutral regulations. *See Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Smith* suggests that free exercise scrutiny might be greater if the regulations implicated otherwise constitutionally protected interests, *id.* at 1601–02, but as discussed above, these regulations do not.

### 4. Equal Protection

DOHM 82–72 provides that trained volunteers may assist in feeding patients in public or voluntary nursing homes, but not in proprietary nursing homes. Plaintiffs allege that this disparate treatment of for profit and not-for-profit nursing homes violates the equal protection clause.

█ Statutory distinctions that neither infringe fundamental rights nor utilize suspect classifications will withstand constitutional challenge if they are rationally related to a legitimate state interest. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam). Plaintiffs assert that strict scrutiny is required both because the distinction between for profit and not-for-profit facilities is a suspect classification and because the regulations implicate "sensitive and intimate personal rights." Plaintiffs cite no cases in support of the proposition that the distinction between for profit and not-for-profit nursing homes is a suspect classification, and the proposition appears meritless. As discussed above, the regulations do not infringe any fundamental rights. Therefore, the rational relationship test applies.

Defendants advance two reasons justifying the distinction between proprietary and not-for-profit nursing homes. The first reason, which was stated in DOHM 82–72, is that the distinction mirrors that in the state minimum wage law, and the regulation thus helps ensure that nursing homes do not violate the minimum wage laws. Second, the defendants argue that the presumably more limited financial resources of not-for-profit nursing homes justifies allowing greater utilization of volunteers than in for-profit facilities.

Plaintiffs assert that the minimum wage laws do not prohibit the use of volunteers in proprietary nursing homes and would be unconstitutional, for the reasons advanced in this action, if they did. The DOH's belief, based on the opinion of an official of the Department of Labor, that the minimum wage laws would prohibit volunteers in proprietary nursing homes, would probably suffice to justify the distinction in DOHM 82–72. In any event, the alternative explanation of assisting not-for-profit nursing homes also seems to promote a legitimate state interest.[2]

The regulations thus withstand equal protection scrutiny.

### Conclusion

No material facts are disputed, and plaintiffs' theories for invalidating the regulations are legally deficient. Accordingly, plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted.

The clerk is directed to enter judgment dismissing the complaint.

SO ORDERED.

---

**2.** Though I treat the two justifications independently, I note that they are perhaps inexorably intertwined. By allowing greater use of volunteers in not-for-profit nursing homes in rec-ognition of their presumably limited resources, the regulations seem to mirror the legislative choice embodied in the minimum wage laws.