Rudy ORTIZ, Plaintiff,

v.

SAN MIGUEL COUNTY, and Francisco Apodaca, Donald Guerin, Ernesto Roybal, I. Lloyd Herrera, Eloy Gonzales, and Frank Griego in their official and individual capacities, Defendants.

Civ. No. 95–971 BB/WWD.

United States District Court,
D. New Mexico.

Nov. 29, 1996.

James A. Burke, Santa Fe NM, for Plaintiff.

Joseph E. Manges, Carpenter, Comeau, Maldegen, Nixon & Templeman, Santa Fe, NM, for Defendants.

## MEMORANDUM OPINION

BLACK, District Judge.

This Opinion addresses several pending motions. The Court has reviewed the submissions of the parties and the relevant law, and, for the reasons set forth below, finds that (1) Defendants' May 15, 1996 motion for summary judgment (Doc. 38) should be GRANTED IN PART and DENIED IN PART, (2) Plaintiff's May 31, 1996 motion for leave to file supplemental affidavits (Doc. 47) should be DENIED, (3) Plaintiff's July 1, 1996 motion for leave to file the affidavit of Theresa Baca (Doc. 52) should be DENIED AS MOOT, and (4) Defendants' August 12, 1996 motion to strike the affidavit of Ernest Quintana (Doc. 60) should be DENIED IN PART and DENIED AS MOOT IN PART.

### I. Facts and Procedural History

Defendant San Miguel County ("County") employed Plaintiff Rudy Ortiz as its maintenance supervisor from September 10, 1988 to January 19, 1993. Plaintiff asserts that this position was not exempt from the County's personnel ordinance, while Defendants claim that it was exempt. On January 19, 1993, the County notified Plaintiff that it was eliminating his position. Defendants claim that

**1340**

the County eliminated Plaintiff's position to save money because the County was experiencing a shortage of funds. Plaintiff, however, contends that Defendants did not actually eliminate his position, and that the County fired him because of his friendship and political affiliation with Roy Gallegos and Ernest Quintana. Mr. Gallegos and Mr. Quintana were members of the San Miguel County Board of County Commissioners ("Board") in 1992, but lost their positions in an election held in November of that year.

On August 30, 1995, Plaintiff filed suit against the County, County Manager Francisco Apodaca, and Board members Donald Guerin, Ernesto Roybal, I. Lloyd Herrera, Eloy Gonzales, and Frank Griego. On August 12, 1996, this Court dismissed Plaintiff's complaint with leave to amend, and Plaintiff filed a first amended complaint on August 29, 1996. Plaintiff's first amended complaint sets forth five claims for relief against Defendants. First, Plaintiff alleges that Defendants' termination of his employment violated his rights to free speech and association under the First and Fourteenth Amendments to the United States Constitution. Second, Plaintiff claims that Defendants' conduct violated his right to procedural due process under the Fourteenth Amendment. Third, Plaintiff asserts that Defendants' conduct violated his constitutional right to substantive due process. Fourth, Plaintiff claims that Defendants' conduct constituted breach of contract. Finally, Plaintiff asserts that Defendants' conduct constituted retaliatory discharge in violation of state law. Plaintiff seeks compensatory damages, prejudgment interest, punitive damages, and attorneys' fees as a result of Defendants' alleged unlawful conduct.

Defendants filed a motion for summary judgment on May 15, 1996, arguing that the Court should grant Defendants summary judgment on Plaintiff's claims under the First Amendment, the due process clause of the Fourteenth Amendment, and breach of contract. After the parties completed the briefing of this motion, Plaintiff moved for leave to file supplemental affidavits and to file the affidavit of Theresa Baca, on May 31, 1996, and July 1, 1996, respectively. Finally,

on August 12, 1996, Defendants moved to strike the affidavit of Ernest Quintana. These motions are now before the Court.

## II. Analysis

### A. Defendants' Motion for Summary Judgment

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522, 1527 (10th Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.*

For issues on which the non-movant will bear the burden of proof at trial, the movant "simply may show—point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993) (quotation omitted). If the movant carries this initial burden, "responsibility then devolves upon the non-movant to show the existence of a genuine issue as to [a] material fact." *Id.* The parties do not dispute that at trial, Plaintiff, the non-movant, will bear the burden of proving his claims. Thus, if Defendants meet their initial burden of demonstrating, either affirmatively or through the absence of evidence, that Plaintiff will be unable to prove his case at trial, Plaintiff, to withstand Defendants' motion for summary judgment, must show the existence of a genuine issue of material fact. *Id.* The Court will consider Defendants' motion for summary judgment in light of these standards.

### 1. Plaintiff's First Amendment Claims

Defendants first argue that the Court should grant Defendants summary judgment on Plaintiff's First Amendment claims based

on protected speech because Plaintiff has not alleged that he engaged in any speech that led to his termination. Plaintiff has not responded to this argument, and the Court has located no evidence in the record indicating that Plaintiff engaged in any speech that may have led to his termination. The Court will therefore grant Defendants' motion for summary judgment on Plaintiff's First Amendment claims to the extent Plaintiff bases these claims on protected speech.

Defendants next assert that the Court should grant them summary judgment on Plaintiff's First Amendment claims based on his association with Mr. Gallegos and Mr. Quintana, because the First Amendment does not protect Plaintiff's friendship with these individuals. Defendants further argue that Plaintiff has failed to produce any evidence that he was politically affiliated with these individuals, and has failed to produce any evidence that he was terminated as a result of such political affiliation. Moreover, Defendants assert that even if Plaintiff was terminated because he was politically affiliated with Mr. Gallegos and Mr. Quintana, Plaintiff's position was properly subject to political patronage dismissal. Finally, the individual Defendants in their individual capacities argue that they are entitled to qualified immunity on Plaintiff's First Amendment association claims. The Court. will consider these arguments in turn.

■ Regarding Defendants' argument that the First Amendment does not protect Plaintiff's friendship with Mr. Gallegos and Mr. Quintana, the Court first notes that according to the Supreme Court,

> [o]ur decisions have referred to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State.... In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Thus, insofar as Plaintiff seeks constitutional protection for his personal friendship with Mr. Gallegos and Mr. Quintana, the Court must determine whether this friendship falls within the category of "certain intimate human relationships [that] must be secured against undue intrusion by the State." *Id.* at 617, 104 S.Ct. at 3249.

Under the current state of the law, it is unclear whether friendship can ever be an "intimate association" protected by the constitution. *See id.* at 620, 104 S.Ct. at 3250–51 (noting the "broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State" but declining to "mark the potentially significant points on this terrain with any precision"); *compare Rode v. Dellarciprete,* 845 F.2d 1195, 1204–05 (3d Cir.1988) (friendship between brother-in-law and sister-in-law not protected as intimate human relationship), *with O'Leary v. Luongo,* 692 F.Supp. 893, 900 (N.D.Ill.1988) ("[The plaintiff's] relationship with his neighbors and friends might very well be the kind of relationship protected by the First Amendment."); *see also Swank v. Smart,* 898 F.2d 1247, 1251–52 (7th Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990) (distinguishing casual encounter between police officer and college student from "the kind of association to which a specially protected constitutional right" might attach).

Nevertheless, the Court need not consider the more difficult aspects of this inquiry because the Tenth Circuit has addressed the issue in a context indistinguishable from the present matter. In *Copp v. Unified School District No. 501,* 882 F.2d 1547 (10th Cir.1989), the plaintiff, who was the head custodian at a high school, argued that the school board wrongfully demoted him because he was "close friends with the school's principal." *Id.* at 1549. The Tenth Circuit acknowledged that the "plaintiff was transferred at least partly because of his relationship with [the school's principal]." *Id.* at 1551. The court nevertheless held

that the "plaintiff's relationship with [the school's principal] is [not] the type of association that the First Amendment shelters from governmental action." The court reasoned that the "intimate human relationships" protected by the Constitution "have [generally] involved familial settings not present in the case before us." *Id.*

Plaintiff in the present matter has failed to allege any facts or to produce any evidence to distinguish his personal friendship with Mr. Gallegos and Mr. Quintana from the plaintiff's friendship with his high school's principal in *Copp. See generally id.* at 1549–51. Thus, to the extent Plaintiff bases his First Amendment claims on his personal friendship with Mr. Gallegos and Mr. Quintana, the Court must grant Defendants' motion for summary judgment on these claims.

█ Plaintiff also asserts that Defendants terminated his employment on the basis of his political affiliation with Mr. Gallegos and Mr. Quintana. Defendants respond that Plaintiff has failed to produce any evidence that he was politically affiliated with these individuals or that he was terminated as a result of any such affiliation. In arguing that Plaintiff has failed to show any political affiliation, Defendants rely on Plaintiff's deposition, in which Plaintiff testified:

Q. Okay, now what was your involvement, if any [in the 1992 elections]?

A. I didn't have any involvement. I just—I was friends with everybody, I mean, you know. I didn't go out and specifically say I am backing such and such a person, you know.

. . . . .

Q. So let me just make sure I understand. The sum and substance of your political activity for Roy Gallegos was voting for him, and what else? Everything you did in support of him.

A. That is it. I just voted for him. I didn't hand out no cards or put up any signs or money or nothing.

Q. Did you encourage other people to vote for him, do you recall?

A. No.

Q. How about Ernest Quintana?

A. I didn't vote for him or contribute anything to him either.

(Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 73–76.)

In response, Plaintiff relies on another portion of his deposition, in which he testified:

Q. I am not sure that I would consider someone who fires someone else because he is a friend, okay, a political firing in the sense of electoral politics. Now do you understand my—are you talking about 'political' in a slightly different sense or not?

. . . . .

A. The way I describe 'political' would be if you are not on their side of the politicians, with the politicians, then they get rid of you. In other words, you don't have freedom of vote or freedom of association. You have to belong to their group in order for them to keep you.... [T]hey get rid of you to hire one of theirs, one of their followers or one of their supporters. That is the way I see 'political.'

(Pl.'s Opp.Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 85–86.) Plaintiff also relies on the affidavit of Ernest Quintana, in which Mr. Quintana testified that

[i]n a small community such as San Miguel County, the nature and type of political support is not always as vocal, and articulate or sophisticated and frequently it is demonstrated by little more than social affiliation, friendship and community awareness on which candidate one supports.

(Pl.'s Supp.Pl.'s Opp.Defs.' Mot.Summ.J. Ex. 1, Aff. Quintana ¶ 5.) On the basis of this conflicting testimony, the Court finds that genuine issues of material fact exist regarding whether Plaintiff was politically affiliated with Mr. Gallegos and Mr. Quintana. *See also Burris v. Willis Indep. Sch. Dist.,* 713 F.2d 1087, 1095 (5th Cir.1983) (In determining that plaintiff's termination was not based solely on plaintiff's friendship with former school board members and superintendent, "[t]he small population size of [the district] is an added important factor in our analysis.").

■ The Court must next consider whether Plaintiff has produced sufficient evidence tending to show that Plaintiff's alleged political affiliation with Mr. Gallegos and Mr. Quintana was a motivating factor in his termination. *Board of County Comm'rs v. Umbehr,* —— U.S. ——, ——, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996); *Laidley v. McClain,* 914 F.2d 1386, 1392 (10th Cir.1990). Perhaps Plaintiff's strongest evidence on this point is his testimony that Defendant Apodaca actually told him that the Board was going to terminate him because of his friendship with Mr. Quintana. (Pl.'s Opp.Defs.' Mot. Summ.J. Ex. 1, Depo. Ortiz, at 82–83.) Plaintiff also relies on the close temporal proximity between the November 1992 election in which Mr. Gallegos and Mr. Quintana lost their seats on the Board, and Plaintiff's January 1993 termination.

Plaintiff further asserts that other supporters of Mr. Gallegos and Mr. Quintana were terminated shortly these candidates lost their seats on the Board. Plaintiff testified in his deposition that when Defendant Apodaca told him the Board was going to fire him because of his friendship with Mr. Quintana, Defendant Apodaca also told him that the Board was going to fire or demote secretary Helen Garcia and administrator Donny Bustos. (Pl.'s Opp.Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 82–83; *see* Defs.' Mot. Summ.J. Ex. F, at 5 ¶ 2 (motion to transfer Ms. Garcia to position at significantly lower salary carried unanimously at January 1993 Board meeting).) Further, Plaintiff alleges that the Board fired Finance Director Theresa Baca because of her political affiliation. (*See* Defs.' Mot.Summ.J. Ex. E, at 2 ¶ F (motion to terminate Theresa Baca as Finance Director carried unanimously at January 1993 Board meeting); *compare* Defs.' Mot.Summ.J. Ex. 4, Aff. Herrera ¶ 5 ("The Manager also reported that the Planning and Finance Director had resigned.").)

Finally, Plaintiff offers evidence that Defendants' proffered reason for his termination was pretextual. Defendants assert that they eliminated Plaintiff's position because the County was experiencing financial difficulties and because Plaintiff's position was costly and inefficient. Defendants have offered evidence supporting this contention. (*See, e.g.,* Defs.' Mot.Summ.J. Ex. 2, Aff. Apodaca.) Nevertheless, Plaintiff has offered evidence tending to show that Defendants' alleged elimination of his position was pretextual. Plaintiff testified that shortly after he was fired, Defendants hired Marybeth Bachert, who was "somehow related to [Defendant] Ernesto Roybal." (Pl.'s Opp.Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 87.) Plaintiff further testified that Defendants "assigned [Frank Berged] to the maintenance department supervisor later on in the year," in October 1993. (*Id.* at 88.) If Plaintiff proves that Defendants replaced him soon after claiming that they eliminated his position, then Plaintiff may be able to establish that Defendants' asserted reason for dismissing him was pretextual.

In sum, the admissible evidence Plaintiff has proffered in support of his claim indicates that: (1) Defendant Apodaca may have told Plaintiff that the Board was going to fire him because of his friendship with Mr. Quintana; (2) the November 1992 election through which Mr. Gallegos and Mr. Quintana lost their seats on the Board was close in time to Plaintiff's January 1993 termination; (3) other supporters of Mr. Gallegos and Mr. Quintana may have been terminated or demoted shortly after the election, and (4) Defendants may have proffered a pretextual reason for Plaintiff's termination.

As noted *supra,* the Court must draw all inferences in Plaintiff's favor in deciding Defendants' motion for summary judgment. *See Laidley,* 914 F.2d at 1394. Moreover, "allegations of retaliation are often supported only by circumstantial evidence," *Durant v. Independent Sch. Dist. No. 16,* 990 F.2d 560, 564 (10th Cir.1993), and the jury should decide questions of credibility. *Bisbee v. Bey,* 39 F.3d 1096, 1101 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2577, 132 L.Ed.2d 827 (1995). While Plaintiff's evidence does not amount to conclusive proof that there is a nexus between his alleged political affiliation and his termination, nor is Plaintiff "trying to make his case on a nod, a wink, and the suggestion that 'we know what those politicians are like.'" *Garrett v. Barnes,* 961 F.2d 629, 634 (7th Cir.1992).

Accordingly, the Court finds that genuine issues of material fact exist regarding whether Plaintiff's alleged political affiliation was a motivating factor in his termination.

■ Defendants also contend that they are entitled to summary judgment on Plaintiff's First Amendment association claims because they would have terminated Plaintiff regardless of his political affiliation. Whether an employer would have reached the same employment decision without regard to an employee's constitutionally protected conduct is generally a question appropriately resolved by the finder of fact. *McEvoy v. Shoemaker*, 882 F.2d 463, 465 (10th Cir.1989). Furthermore, much of Plaintiff's evidence tending to show that he was terminated because of his political affiliation also contradicts Defendants' claim that they would have terminated Plaintiff regardless of that affiliation. In particular, Plaintiff's evidence regarding pretext tends to negate Defendants' claim that they would have fired Plaintiff for fiscal reasons regardless of his affiliation. The Court therefore finds that genuine issues of material fact exist with respect to this issue.

■ Defendants next assert that even if Plaintiff was fired because of his political affiliation, they are entitled to summary judgment because political support or party affiliation is an appropriate requirement for the effective performance of the position of maintenance supervisor. The practice of terminating government employees on the basis of political affiliation is a form of political patronage. *Elrod v. Burns*, 427 U.S. 347, 353, 96 S.Ct. 2673, 2679–80, 49 L.Ed.2d 547 (1976) (plurality opinion). Although political patronage dismissals clearly infringe on First Amendment interests, the United States Supreme Court has held that party affiliation is an acceptable requirement for some types of government employment. *Id.* at 367–68, 96 S.Ct. at 2686–87; *Branti v. Finkel*, 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980). In *Elrod*, a plurality of the Supreme Court concluded that a public employer could properly discharge public employees from jobs they were adequately performing on the basis of their political affiliation if the employees held "policymaking" or "confidential" positions. 427 U.S. at 375, 96 S.Ct. at 2690

(Stewart, J., concurring). However, in *Branti*, the Court announced that the ultimate inquiry with regard to the permissibility of a political patronage dismissal is not whether a position is "policymaking" or "confidential," but rather "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. Thus, while a position's policymaking or confidential nature is still relevant, after *Branti* those categories are no longer dispositive. *Dickeson v. Quarberg*, 844 F.2d 1435, 1441 (10th Cir.1988).

The Court notes that the public employer bears the burden of proving that political affiliation is an appropriate requirement for the effective performance of the position at issue. *Id.* Also, "[i]n close cases, doubt should be resolved in favor of the public employee subject to the dismissal." *Id.* at 1442. The Court must therefore consider whether Defendants have proved that political affiliation is an appropriate requirement for the effective performance of the position of San Miguel County maintenance supervisor.

■ While *Elrod* and *Branti* provide some guidance, the Supreme Court has not articulated what factors the courts should use in deciding whether a particular position falls within the *Branti* parameters. Thus, the lower courts apply various similar tests to determine this issue. *Compare Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), *with Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). According to the Seventh Circuit, courts should inquire "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision-making on issues where there is room for principled disagreement on goals or their implementation." *Nekolny*, 653 F.2d at 1170. The Court finds this test persuasive and will use it as a yardstick. *See also Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 313, 88

L.Ed.2d 289 (1985) (affirming *Nekolny* standard).

The manner in which other courts have applied this and similar tests to particular positions is also important in determining the extent to which a public employee is subject to political patronage dismissal. *See Jimenez Fuentes,* 807 F.2d at 240–41. The parties have not cited a case, and the Court has not located one, that addresses the precise situation involved here. However, various courts have considered situations that are somewhat analogous to the present matter. For example, in *Dickeson,* the Tenth Circuit considered whether the head jailer for a joint law enforcement facility was properly subject to political patronage dismissal. 844 F.2d at 1443. The head jailer supervised four employees, prepared weekly work schedules for these employees, ordered food, planned menus, prepared meals, and otherwise housed and fed the prisoners at the facility. *Id.* at 1443 & n. 7. In view of these job duties, the Tenth Circuit concluded that "it cannot be said that party affiliation is an appropriate requirement for the effective performance of a head jailer." *Id.*

Similarly, in *Nekolny,* the Seventh Circuit considered whether the plaintiff, a township senior citizens coordinator, was properly subject to political patronage dismissal. 653 F.2d at 1170. The *Nekolny* court determined that genuine issues of material fact existed regarding whether the senior citizens coordinator was a policymaker subject to patronage dismissal. *Id.* As the senior citizens coordinator, the plaintiff's "functions included conducting feasibility studies and other research including the nature and extent of programs for senior citizens. His proposals were directed to the Township Supervisor and the Board of Auditors." *Id.* Furthermore, the plaintiff was "one of the four highest paid employees in the Township." *Id.*

According to Plaintiff's evidence, Plaintiff's position is very similar to the positions of the plaintiffs in *Dickeson,* and to a lesser extent, *Nekolny.* As maintenance supervisor, Plaintiff was responsible for maintenance of the six buildings occupied by County employees. (Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 29–30.) Like the plaintiff in *Dickeson,* Plaintiff supervised a maximum of four employees, and at the time of his dismissal, only two. (*Id.*) Plaintiff prepared weekly work schedules for these employees. (*Id.*) Plaintiff also ordered the supplies necessary to maintain the County buildings, inspected these buildings, and conducted some repairs himself. (*Id.* at 34–35.) Like the plaintiff in *Nekolny,* Plaintiff's proposals to conduct unusual or expensive repairs were referred to the Finance Department for approval. (*Id.* at 39–40.) The cost of his department's largest annual job, maintaining boilers, did not exceed $5,000. (*Id.* at 45.) Also like the plaintiff in *Nekolny,* Plaintiff was "about the eighth highest paid County employee (of 45 County employees)." (Defs.' Mot.Summ.J. Ex. 2, Aff. Apodaca ¶ 3.)

Plaintiff did draft the maintenance department's annual budget of approximately $149,-000. (*Id.*) However, this fact does not sufficiently distinguish the present matter from *Dickeson* and *Nekolny.* Plaintiff testified that he prepared the maintenance department budget in the following manner:

> Well, what happened there, when I went in there, they had—I think they used to take the figures from the prior year and compare it to the new year and maybe add another 10 percent or something in anticipation in case something did happen. And sometimes all the money wasn't used for that fiscal year, is what I am saying.

(Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 41.) Thus, it appears that Plaintiff was not required to make judgments about the allotment of scarce resources in drafting the maintenance department's budget. *Cf. Ray v. City of Leeds,* 837 F.2d 1542, 1544 (11th Cir.1988) ("Where a policymaker's position requires decisions concerning the allotment of scarce resources, her political beliefs and her compatibility with the hiring authority are clearly relevant to her performance.").

In conclusion, the Court finds that Plaintiff's position is analogous to the position of head jailer in *Dickeson,* 844 F.2d at 1443, and senior citizens coordinator in *Nekolny,* 653 F.2d at 1170. Based on the present record, the Court cannot say that Plaintiff meaningfully participated in government decision-

making on issues where there was room for principled disagreement on goals or their implementation. *Nekolny*, 653 F.2d at 1170; *see also Mendez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1258 (1st Cir.1987) ("[I]f the employee is responsible only for duties that are measured solely by strictly technical or professional criteria, the job is nonpartisan in nature and not properly a target of patronage dismissal."). Accordingly, the Court holds that Plaintiff, as the San Miguel County maintenance supervisor, was not properly subject to political patronage dismissal under the First Amendment. For all of the above reasons, the Court will deny Defendants' motion for summary judgment on Plaintiff's First Amendment claims based on political patronage dismissal.

▪ However, the Court must also consider Defendants' argument that Defendants Apodaca, Guerin, Roybal, Herrera, Gonzales, and Griego in their individual capacities are entitled to qualified immunity on Plaintiff's First Amendment association claims. "Government officials who perform discretionary functions generally are shielded from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights known to a reasonable person." *Mumford v. Zieba*, 4 F.3d 429, 432 (6th Cir.1993) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."). Thus, the Court must determine whether the alleged conduct of Defendants Apodaca, Guerin, Roybal, Herrera, Gonzales, and Griego, in terminating Plaintiff's employment on the basis of his political affiliation, violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known.

The Court finds that Defendants' conduct did not violate clearly established law. As the Second and Sixth Circuits have noted, "courts have proceeded on a case-by-case basis to enumerate the permissible and impermissible instances of politically motivated employment decisions. Identifying generic categories of positions where partisan selection and rejection are permissible has proven to be an elusive and intractable task." *Mumford*, 4 F.3d at 434 (citation and quotation omitted). The analysis in which the Court engaged *supra* bears out this observation. Furthermore, the Court is aware of no case so analogous to the case at bar that it clearly establishes whether Plaintiff's position was properly subject to patronage dismissal. "Accordingly, it cannot be said that any [public official] of reasonable competence in [Defendants'] position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from [terminating Plaintiff on the basis of his political affiliation]." *Id.* at 435. The Court therefore finds that the doctrine of qualified immunity shields Defendants Apodaca, Guerin, Roybal, Herrera, Gonzales, and Griego in their individual capacities from Plaintiff's First Amendment association claims.

### 2. Plaintiff's Due Process Claims

▪ Defendants also argue that the Court should grant them summary judgment on Plaintiff's procedural and substantive due process claims. "[T]he requirements of ... due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "Property interests, of course, are not created by the Constitution." *Id.* at 577, 92 S.Ct. at 2709. Rather, "[d]etermination of whether a plaintiff has a property interest is a question of state law." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). "An at will employee has no property interest in employment." *Id.*

All of the evidence in the record tends to demonstrate that Plaintiff was an "exempt" employee, that is, an employee exempt from the personnel rules and regulations of San Miguel County. Plaintiff has produced no evidence to the contrary, and in fact admitted in his deposition that when he was hired, he understood that he was an exempt employee. (Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz, at 46.) New Mexico courts have generally held

that exempt employees are employees at will and have no property interest in their employment, *Trujillo v. Gonzales,* 106 N.M. 620, 621, 747 P.2d 915, 916 (1987), and Plaintiff has offered no reason why his employment was different in this respect. In fact, Plaintiff testified in his deposition as follows:

Q. What was your understanding of an exempt employee?

A. Well, exempt employee as far as I can understand it, you are under the discretion of the commission.

Q. What do you mean, "you're under"?

A. You work for the commission. I guess they can hire and fire you whenever they want to.

(Defs.' Mot.Summ.J. Ex. 1, Depo. Ortiz at 46.) The Court therefore finds that as a matter of law, Plaintiff did not have a property interest in his employment as San Miguel County maintenance supervisor and the Court will grant Defendants' motion for summary judgment on Plaintiff's due process claims.[1]

### 3. Plaintiff's Contract Claims

■ Finally, Defendants argue that the Court should grant them summary judgment on Plaintiff's breach of contract claims because as an "exempt" employee, Plaintiff had no contract with Defendants. The Court has already determined that Plaintiff was an exempt, at will employee of the County. Plaintiff has presented no other evidence tending to demonstrate the existence of an employment contract between himself and the County that the County could have breached. The Court will therefore grant Defendants' motion for summary judgment on Plaintiff's contract claims.

### B. Plaintiff's Motions for Leave to File Affidavits *and* Defendants' Motion to Strike Affidavit

■ The Court will deny Plaintiff's motion to file supplemental affidavits under Federal Rule of Civil Procedure 56(f) because Plaintiff did not "detail[ ] by affidavit the evidence [Plaintiff] expected to discover."

*Jarvis v. Nobel/Sysco Food Servs. Co.,* 985 F.2d 1419, 1420 (10th Cir.1993). Further, the Court will deny as moot Plaintiff's motion to file the affidavit of Theresa Baca because the Court did not need to rely on Ms. Baca's affidavit in denying that portion of Defendants' motion for summary judgment to which Ms. Baca's affidavit might have been relevant, specifically, Plaintiff's First Amendment association claims.

The Court will deny that portion of Defendants' motion to strike the affidavit of Ernest Quintana concerning the second sentence of the fifth paragraph of that affidavit because the Court finds that this sentence is proper lay opinion evidence under Federal Rule of Evidence 701. The Court will deny as moot the remainder of Defendants' motion to strike the affidavit of Ernest Quintana, because the Court did not need to rely on the remainder of Mr. Quintana's affidavit in denying that portion of Defendants' motion for summary judgment to which Mr. Quintana's affidavit might have been relevant, specifically, Plaintiff's First Amendment association claims.

### III. Conclusion

The Court will grant in part and deny in part Defendants' May 15, 1996 motion for summary judgment. The Court will deny Defendants' motion with respect to Plaintiff's First Amendment claims against the County and the individual Defendants in their official capacities that these Defendants wrongfully terminated Plaintiff as a result of his political affiliation. In all other respects the Court will grant Defendants' motion for summary judgment. The Court will deny Plaintiff's motion to file supplemental affidavits, deny as moot Plaintiff's motion to file the affidavit of Theresa Baca, and deny in part and deny as moot in part Defendants' motion to strike the affidavit of Ernest Quintana.

---

1. Because the Court will grant Defendants' motion for summary judgment on Plaintiff's due process claims on this basis, the Court need not consider Defendants' argument that the individual Defendants in their individual capacities are entitled to qualified immunity from these claims.