## Brenda "Penny" RENO

v.

## METROPOLITAN TRANSIT AUTHORITY, et al.

### Civil Action No. H–96–141.

United States District Court, S.D. Texas, Houston Division.

Aug. 12, 1997.

---

Stephen P. Glover, Groves and Glover, Houston, TX, for Plaintiff.

Brenda "Penny" Reno, Houston, TX, pro se.

A. Martin Wickliff, Jr., Wickliff and Hall, Houston, TX, Paula Johnson Alexander, Metro Transit Authority, Legal Dept., Houston, TX, for Defendants.

### AMENDED ORDER

GILMORE, District Judge.

Pending before the Court is Defendant's Motion to Summary Judgment (Instrument No. 39). Having reviewed the submissions of the parties and the applicable law, this Court has determined that Defendant's Motion should be **GRANTED.**

### I. Background

Plaintiff, Brenda "Penny" Reno ("Reno"), a fifty-seven year old white female, brings this

action against her employer, Defendant Metropolitan Transit Authority ("Metro"), claiming that she was discriminated against in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII") and deprived of her First Amendment right of free association in violation of 42 U.S.C. § 1983. In August of 1988, Reno began employment with Metro as a word processor in the Procurement Department. Approximately one year later, Reno was promoted to the position of Senior Word Processing Specialist under the supervision of Carlos Moorer ("Moorer").

In the fall of 1991, Reno applied for promotion to the position of Assistant Buyer in the Administration/Contracts Department. Carl Dyer ("Dyer"), manager of the department, rejected her application and instead hired Margot Cruz ("Cruz"), a Hispanic woman who was, at that time, under forty years old. In the spring of 1992, Reno applied for another Assistant Buyer position. However, she was not chosen for this position either. Department manager Rick Haydel ("Haydel") instead selected Ninfa Muench ("Muench"), a Hispanic female in her late twenties, to fill the vacancy. Finally, in the fall of 1993, Reno applied for the position of Inventory Control Technician in the Materials Management Department. Reno was again rejected and the job was awarded by department manager, Bud Nahay ("Nahay"), to Steve Marshall ("Marshall"), an African–American male also in his late twenties.

Reno filed an internal grievance with Metro's Affirmative Action Department in March of 1994. Reno contended that her failure to obtain a promotion was not based on her lack of qualifications but rather on unlawful criteria such as age, race and gender. The Department conducted an investigation and determined that Reno was not denied, for discriminatory reasons, any of the three promotions she requested. On April 18, 1994, Reno filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming age and reverse-race discrimination with respect to the Assistant Buyer positions and age, sex, and reverse-race discrimination with respect to the Inventory Control Technician position. She

also claimed that her immediate supervisor, Moorer, retaliated against her for filing the 1994 internal grievance. On October 16, 1995, the EEOC issued a determination and a right to sue notice. Reno filed this action on January 16, 1996, asserting claims under Title VII for age discrimination, race discrimination and retaliation. On April 22, 1996, Reno amended her complaint, adding causes of action under Title VII for gender discrimination and sexual harassment and a claim under § 1983 for deprivation of her First Amendment right to free association. Reno also added Moorer and Vince Raymond ("Raymond"), the department managers' supervisor, as defendants. A second amended complaint was filed on July 15, 1996, developing with greater factual specificity the basis for each of Reno's claims.

On April 15, 1997, Metro filed a motion for summary judgment, arguing that it is entitled to judgment as a matter of law for the following reasons: (1) Reno's claims for gender discrimination and sexual harassment were not filed within ninety days after her receipt of the right to sue notice and are thus time barred; (2) Reno did not properly exhaust her administrative remedies for her sexual harassment claim as no such claim was presented to the EEOC in Reno's 1994 complaint; (3) Reno cannot premise her Title VII claims on the 1991 or 1992 promotion decisions as she failed to file a charge of discrimination with the EEOC within 300 days after either event's occurrence; (4) Reno cannot establish a *prima facie* case of age, race or gender discrimination with regard to Metro's decision not to hire her for the Inventory Control Technician position because she was not qualified for the job; (5) Reno cannot establish a *prima facie* case of retaliation because she will be unable to prove Metro's alleged retaliatory actions constituted an "adverse employment action" nor can she prove a causal link between her filing an internal grievance and Metro's purported retaliatory action; and (6) Reno's § 1983 claim must fail because there is no evidence that Metro violated Reno's First Amendment rights. Further, Metro argues that even if Reno were able to establish such a violation, Moorer and Raymond are entitled to qualified immunity. Metro also claims that Reno

has not proven that the alleged unlawful conduct was pursuant to official policy as required to hold Metro liable.

Conversely, Reno contends that her sexual harassment and gender discrimination claims are not time-barred under Rule 15(c) of the Federal Rules of Civil Procedure, which permits an amendment adding claims that arose out of the conduct set forth in an original complaint to relate back to the date the original pleading was filed, so as not to be untimely. Reno further argues that she did in fact exhaust her administrative remedies for her sexual harassment claim and that recovery is permissible for Metro's refusal to promote her in 1991 and 1992 because such decisions were a part of a continuing course of discriminatory conduct. Finally, Reno argues that fact issues clearly exist as to the merits of each of the claims asserted herein, thereby precluding summary judgment.

## II. Standard of Review

■■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1088 (5th Cir.1990). The summary judgment procedure, therefore, "enables a party 'who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues.' " *Microsoft Corp. v. CMOS Techs. Inc.*, 872 F.Supp. 1329, 1334 (D.N.J.1994) (quoting *Lujan v. National Wildlife Federation*, 497

U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990)).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting FED. R. CIV. P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294. To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514; *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992) ("To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue...."). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonable find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Summary judgment evidence in discriminatory treatment cases brought under Title VII or the ADEA is examined under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir.1993) (holding that *McDonnell Douglas* burden-shifting approach applies to claims brought under the ADEA). First, a plaintiff must establish a *prima facie* case of alleged wrong doing by a preponderance of the evidence. *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 507 (5th Cir.1994). If that requirement

is met and a *prima facie* case is established, the burden then shifts to the defendant to articulate legitimate, non-discriminatory reasons for the discharge. *Id.* To meet that burden, the defendant must clearly set forth through admissible evidence reasons that would support a finding that unlawful discrimination was not the basis for the employment action. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). After the defendant has provided legitimate, non-discriminatory reasons for its action, the burden shifts back to the plaintiff to demonstrate that the defendant's articulated reasons are mere pretexts for discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). The plaintiff can satisfy this requirement by showing that the reason articulated by the defendant was false and that the defendant's real reason for the discharge was discriminatory. *Id.* Triable issues will only be found if there is a conflict in substantial evidence. *LaPierre v. Benson Nissan,* 86 F.3d 444, 449 (5th Cir.1996). In the employment discrimination context, "evidence is substantial if it is 'such as to allow a rational factfinder to make a reasonable inference that [race or age] was a determinative reason for the employment decision.'" *LaPierre,* 86 F.3d at 449 (quoting *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 993 (5th Cir.1996)). Employing the burden-shifting approach, however, does not relieve plaintiff of her ultimate burden of proving intentional discrimination. *St. Mary's,* 509 U.S. at 506–07, 113 S.Ct. at 2747–48.

### III. Sexual Harassment Claim

Metro contends that Reno's sexual harassment claim was neither timely filed nor was Reno's administrative remedies exhausted prior to the assertion of the claim in the instant action, Metro is correct.

■ "The filing of an administrative complaint is ordinarily a jurisdictional prerequisite to a Title VII action." *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995). Moreover, "[c]ivil complaints filed under Title VII may only encompass 'discrimination like or related to allegations contained in the [EEOC] charge and growing out of such allegation during the pendency of the case before the Commission.'" *Clemmer v. Enron Corp.,* 882 F.Supp. 606, 610 (S.D.Tex.1995) (quoting *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio,* 40 F.3d 698, 711 (5th Cir., 1994)). In other words, the suit filed should be limited to "the discrimination stated in the charge itself or developed in the course of a reasonable EEOC investigation of that charge." *King v. Seaboard Coast Line R.R. Co.,* 538 F.2d 581, 583 (4th Cir.1976).

■ In her charge filed with the EEOC on April 18, 1994, Reno complains of sex, age and race discrimination. (Def.'s Mot. for Summ. J., Instr. No. 39 at Ex. 6). Reno did not, however, assert a claim for sexual harassment. Neither did Reno include any mention of a possible sexual harassment claim in her description of the events generating her complaint. Reno simply states that:

> Within the past three years, I have applied for three positions, without success. On two occasions, I applied for the position of Assistant Buyer (in 1991 & 1992). In December 1993, I applied for the position of Inventory Control Technician. I filled an internal grievance on March 8, 1994, and was subjected to retaliation shortly thereafter. . . . I believe that I have been discriminated against because of my sex, female, and race, White, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act.

(Def.'s Mot. for Summ. J., Instr. No. 39 at Ex. 9).

Based on the claims asserted in her EEOC charge and the contentions contained therein, this Court does not find that Reno's sexual harassment claim would have been developed and subsequently investigated during the course of the EEOC proceedings. The facts allegedly forming the basis of Reno's charge of age, race and sex discrimination are completely unrelated to Reno's allegations that she was harassed by Moorer, that Moorer "frequently makes rude, disparaging remarks about women and twists every innocent comment into one with sexual over-

tones" and that Moorer "approached Ms. Reno from behind and intentionally pressed himself against her with his lower body while she is sitting at her desk." (P.'s Sec. Am. Compl., Instr. No. 18 at 6). Moorer was not involved in any of Metro's decisions not to promote Reno nor is it reasonable to assume that his allegedly unlawful conduct would have been uncovered during the course of an EEOC investigation aimed at discovering whether Reno had been improperly denied certain promotions. *See Torriero v. Olin Corp.*, 684 F.Supp. 1165, 1170 (S.D.N.Y.1988) (holding that plaintiff's EEOC charge alleging sex discrimination did not encompass claim of sexual harassment subsequently asserted in Title VII action in federal court because the facts underlying sexual harassment claim could not be inferred from the factual assertions made in the EEOC charge nor would they have been uncovered absent specific allegations to indicate such a cause of action existed).

Nevertheless, Reno argues that the claim of sex discrimination she advanced in her EEOC charge is sufficiently broad enough to encompass her sexual harassment claim. However, simply "[b]ecause a claim of sexual harassment may constitute sexual discrimination does not imply that a charge consisting of facts which purportedly constitute sexual discrimination necessarily includes all forms of sexual discrimination." *Sandom v. Travelers Mortgage Servs., Inc.*, 752 F.Supp. 1240, 1247 (D.N.J.1990); *see Riley v. Tech. & Management Servs. Corp.*, 872 F.Supp. 1454, 1459 (D.Md.1995) (holding that a charge that alleged discrimination on the basis of sex did not support a complaint for hostile environment sexual harassment).

For instance, in the pending action, Reno's sexual harassment count is based on an entirely different set of facts than the facts claimed in support of Reno's sex discrimination claim. In *Zalewski v. M.A.R.S. Enterprises, Ltd.*, the plaintiff, like Reno, filed an EEOC charge which specifically alleged sex discrimination but failed to include factual allegations capable of sustaining the sexual harassment claim he later asserted in federal court. 561 F.Supp. 601, 605 (D.Del.1982). The court held that "[t]he sole common de-

nominator of the two charges is the fact that the discrimination allegedly involved sex, yet the two sex discrimination claims were in no way 'alike or related.'" *Id.* at 605. Thus, absent greater factual interrelation between the two claims, Reno cannot contend that her sexual harassment claim was "'like or related to allegations contained in the [EEOC] charge'" or "'growing out of such allegation during the pendency of the case before the Commission.'" *Clemmer*, 882 F.Supp. at 610 (quoting *National Ass'n of Gov't Employees*, 40 F.3d at 711); *see also Prizevoits v. Indiana Bell Tel. Co.*, 882 F.Supp. 787, 791 (S.D.Ind.1995) (plaintiff's claim of sex discrimination did not support claim of sexual harassment as charge did not provide appropriate notice that harassment was involved); *Stehle v. General Mills Restaurant*, 875 F.Supp. 320, 323 (D.S.C.1994) (where plaintiff's claim of sexual harassment was neither included in her EEOC charge nor discovered by the EEOC during the course of its investigation, administrative remedies had not been properly exhausted). Thus, this Court finds that Reno's administrative remedies with respect to her sexual harassment were not exhausted, thereby depriving the Court of jurisdiction over such claim.

■ Even assuming, however, that Reno's sexual harassment count was properly filed with the EEOC, Reno's claim was still untimely—filed more than three months after the expiration of the ninety day time period for filing suit. *See Lee v. Kroger Co.*, 901 F.Supp. 1218, 1223 (S.D.Tex.1995) ("[A] civil action must be filed in district court within ninety days of the receipt of the right-to-sue letter from the EEOC."). Reno argues that the claim is not time barred under the relation-back doctrine. Rule 15(c) of the Federal Rules of Civil Procedure, which governs the amendment of complaints, provides that an "amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c). "'So long as the Title VII claim is based on the discrimination originally charged in the complaint, allowing it to relate back to the date

of filing ... works no hardship on the defendant for the original complaint furnished adequate notice of the nature of the suit.'" *Watkins v. Lujan*, 922 F.2d 261, 265 (5th Cir.1991) (quoting *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1070 (5th Cir.1981)). When, however, the plaintiff attempts to allege an entirely different transaction by amendment or makes such substantial alterations to the original pleading that the defendant is, as a result, deprived of notice of the conduct which forms the basis of the newly asserted claim, Rule 15(c) will not authorize the relation back. CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1497 (2d ed.1990).

The only acts of alleged discrimination addressed in Reno's original complaint are the following: (1) "Metro has consistently failed to hire [Reno] for positions [for advancement] or otherwise promote her. Metro tends to award the jobs to which she applies to younger, less qualified people;" (2) "Metro has violated Title VII of the Civil Rights Act because it hired or promoted racial minorities even when Ms. Reno was more qualified for the positions for which she applied;" and (3) "Metro retaliated against Ms. Reno when it learned she filed charges with the EEOC." (Pl.'s Orig. Compl., Instr. No. I at 3). Clearly, Reno's sexual harassment claim is not based on any of the conduct described in Reno's original complaint. Thus, Reno's contention that Rule 15(c) prevents the dismissal of her untimely sexual harassment claim is without merit.

## IV. 1991 and 1992 Promotion Decisions

Metro argues that Reno should not be permitted to pursue claims based on Metro's refusal to award her a promotion in 1991 and 1992 because Reno failed to timely file an EEOC charge with respect to either of these allegedly discriminatory decisions. Reno does not dispute that her EEOC charge was filed after the three hundred day period for filing such claims had expired, rather she argues that the incidents reflect a continuing course of discriminatory conduct, allowing Reno's claim to accrue instead on the date of the last act of discrimination-the 1993 promotion decision.

An aggrieved party is required under Title VII to file a charge of discrimination with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Courts have, however, extended the mandatory filing period through the application of the "continuing violation theory". *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 979 (5th Cir.1983). This theory allows additional claims—claims otherwise barred by the statute of limitations to be asserted if sufficiently related to the timely filed claim, thereby relieving the plaintiff of the burden of proving that the entire violation she complains of occurred within the actionable period. *Id.*; LEX. K. LARSON, EMPLOYMENT DISCRIMINATION § 72.08[4][b] (2d ed.1996). "To establish a continuing violation for these purposes it is said that the plaintiff must show 'a series of related acts, one or more of which falls within the [300] day period.'" *Berry*, 715 F.2d at 979 (quoting B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW, 232 (1979)). The following factors, although not exhaustive, are considered in making this determination:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.* a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry*, 715 F.2d at 981.

The plaintiff, however, may not use the "continuing violation theory" to "resurrect claims about discrimination concluded in the past, even though its effects persist." *McKenzie v. Sawyer*, 684 F.2d 62, 72

(D.C.Cir.1982); *see United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute [Title VII] was passed. . . . [I]t is merely an unfortunate event in history which has no present legal consequences."). Reno cannot, due to the circumstances surrounding Metro's refusal to promote her in 1991 and 1992, prevail on her claim that these incidents evince an overall pattern of continuing discriminatory conduct by Metro. Reno's promotion denials occurred over a three year period and each involved a different hiring manager, negating Reno's contention that such decisions were linked to or otherwise shared commonality with the 1993 promotion denial. *See Scott v. Claytor,* 469 F.Supp. 22, 25 (D.D.C.1978) (holding that three denied promotions over the course of three years, where the decisions were made by three different selection officials and involved different qualifications were not sufficiently related to constitute a continuing violation); *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 800–01 (11th Cir.1988) (finding that two denied promotions arising from separate decisions made by different managers did not constitute a continuing violation). Events as unrelated and isolated as the events at issue, should have, due to the permanent or final nature of these decisions, prompted Reno to take appropriate action immediately upon notification of her rejection. Moreover, refusal to promote generally only constitutes a continuing violation "where promotion is a continuing possibility and is not based on specific sporadic vacancies, or where a discriminatory pattern or practice constitutes a standard operating procedure that affects plaintiff during the statutory period", neither of which has been shown here. *Murphy v. Philadelphia Gas Works,* 34 Fair Empl. Prac. Cas. 1463, 1466 (E.D.Pa.1984) (citations omitted). Thus, the Court finds that the 1991 and 1992 promotions are not a continuing violation and accordingly, Reno's claims based on these decisions are dismissed as untimely.

## V. Age Discrimination Claim

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The Act limits coverage to individuals who are at least forty years of age. *Id.* To establish a *prima facie* case of intentional discrimination in an ADEA case, the plaintiff must show (1) that she was within the protected age group; (2) that she had been adversely affected by the employer's decision; (3) that she was qualified for the position; and (4) that the job remained open or was filled by someone younger. *Lindsey v. Prive Corp.,* 987 F.2d 324, 326–27 (5th Cir.1993); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 149 (5th Cir.1995). Underlying each ADEA claim is proof that a discriminatory purpose or motive prompted the defendant to an action or a decision based on age which was adverse to the plaintiff. *See Armendariz,* 58 F.3d at 147.

Reno claims she was rejected for the Inventory Control Technician position because of her age. Reno maintains that her job performance has, at all times, been outstanding and that she has even completed additional training, such as course work in management and computer operations, to further enhance her job skills, making her more than qualified to assume any of the positions for which she applied. However, an employee's subjective belief that she is qualified is irrelevant to a *prima facie* case of discrimination. Rather, it is the perception of the employer that is determinative. *See Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 290–92 (8th Cir.1982) (suggesting that plaintiff's own testimony of her qualifications for a particular position is of little evidentiary value and the most probative evidence will come from the employer); HOWARD C. EGLIT, AGE DISCRIMINATION § 7.06 (2d ed.1997) (stating that a job applicant's subjective belief that she is qualified to assume a position is irrelevant). The job description posted by Metro for the position at issue states that a minimum of three years experience in "bus parts storeroom operations" was required as was a working "knowledge of auto parts". (Def.'s Br. Supp. Mot. Summ. J., Instr. No. 40 at Ex. 2). Also required was an "in-depth

working knowledge of bus/auto parts and use of parts books" and "experience in research and parts identification". *Id.* Reno testified that she did not have experience in bus parts storeroom operations nor had she worked in storeroom operations while at Metro. (*Id.* at Ex. A, Reno Dep. pp. 109, 125, 126). Because Reno did not have the requisite skills and experience, Reno cannot establish that she was qualified to fill the position and consequently becomes unable to satisfy her initial burden of proving a *prima facie* case of age discrimination.

■ Even assuming, though, that Reno could sustain her burden of proving a *prima facie* case, Reno has not shown that Metro's articulated reason for refusing to promote her—her lack of qualifications—was a pretext for age discrimination. To satisfy this burden Reno must demonstrate that Metro's proffered reasons were not the true reasons for her failure to obtain a promotion but rather only a pretext for discrimination. In other words, Reno must either introduce evidence showing that the reasons stated by Metro are untrue as a matter of fact, or although true, were a mere cover for illegal discrimination. *Waggoner v. City of Garland, Texas*, 987 F.2d 1160, 1164 (5th Cir. 1993).

■ Reno first argues that pretext is apparent from Moorer's frequent and disparaging remarks about her age. Reno claims that Moorer told her fellow employees at a staff meeting that Reno "would probably be able to take the retirement package when offered again." (Pl.'s Sec. Am. Compl., Instr. No. 18 at 5). Reno also claims Moorer "made comments about her age and her having creaky knees." *Id.* Derogatory remarks may "serve as sufficient evidence of age discrimination if the offered comments are: (1) age related; (2) proximate in time to the (adverse employment action); (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996); *see also Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir.1992) ("[W]hen age related comments are 'vague and remote in time and administrative hier-

archy, they are no more than stray remarks,' which are insufficient to establish discrimination.") (quoting *Guthrie v. Tifco Industries*, 941 F.2d 374, 379 (5th Cir.1991)). In this case, Moorer was not responsible for Metro's decision to deny Reno's request for promotion nor is there any evidence to indicate that Moorer's comments coincided, even if remotely, with Reno's unsuccessful attempt to acquire the Inventory Control Technician position. Thus, Moorer's alleged comments appear to be merely stray remarks, incompetent to establish either pretext or that Metro's decision was discriminatory.

Next, Reno argues that job qualifications and position requirements for vacancies at Metro were irrelevant; that Metro instead "tend[ed] to award the jobs according to the 'good ole boy' system and the jobs [Reno] applied for typically [went] to younger, less qualified people." (Pl.'s Sec. Am. Compl., Instr. No. 18 at 4). However, Ruth White, Metro's EEOC Administration Officer, stated that the person hired for the position, Marshall, had been employed as a Storeroom Attendant for six years and a Storeroom Leaderman for four years, clearly satisfying the Inventory Control Technician position's background requirements. Moreover, even assuming Reno was correct—that employees at Metro were promoted on the "good ole boy system"—this statement, at most, only indicates that Metro's decision may have been arbitrary or unjustified. "[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992). Rather, it addresses "decisions which are unlawfully motivated." *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1508 (5th Cir.1988).

■ Reno also contends that pretext is demonstrated from the fact that "each time [she] applied for a position within Metro, a younger applicant was selected." (Pl.'s Resp. to Def's Mot. Summ. J., Instr. No. 41 at 12). However, this fact does not prove that Metro's proffered reasons for her rejection—her lack of qualifications—was not the true reason for its decision nor does it show that age was a determinative factor in Met-

ro's decision not to select Reno for the particular position at issue—the Inventory Control Technician position. *See Rhodes,* 75 F.3d at 993 ("[A] jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was actually what motivated the employer and (2) creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains."). Metro's decisions regarding the Assistant Buyer positions, which were made by different managers, neither of whom were involved in the selection process for the Inventory Control Technician position, do not necessarily indicate, due to their remoteness in time and lack of mutuality, that, in this instance, age, rather than Reno's failure to satisfy the job's minimum requirements, was the motivating factor in Metro's decision.

The only other evidence Reno offers in support of her claim is her own testimony, which not only fails to provide specific facts that would support an inference of discrimination but also reveals nothing more than her subjective belief that she was not promoted on account of her age. An employee's " 'own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination." ' *Schultz v. General Elec. Capital Corp.,* 37 F.3d 329, 334 (7th Cir.1994) (quoting *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1304 (7th Cir.1991)); *see also Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir.1996) (holding that former employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive former employer's summary judgment motion). Thus, there is no evidence in the record to indicate with any degree of certainty that age was a motivating factor in Metro's decision not to promote Reno. Metro's motion with respect to Reno's age discrimination claim will be granted.

## VI. Reverse–Race Discrimination Claim

To establish a *prima facie* case in a reverse discrimination suit, the plaintiff must prove that: (1) that she belongs to a class; (2) that she was qualified for and applied for a promotion; (3) that she was rejected despite her qualifications; and (4) that other employees with equal or lesser qualifications who were members of a protected minority were promoted. *See Wilson v. Bailey,* 934 F.2d 301, 304 (11th Cir.1991); *Young v. City of Houston, Texas,* 906 F.2d 177, 180 (5th Cir.1990).[1] Reno has produced no evidence, other than her own conclusory assertions, that objectively shows that she was qualified for the position or that she was otherwise denied the promotion despite those qualifications. Without credible evidence demonstrating her qualifications for the Inventory Control Technician position, Reno cannot establish a *prima facie* case of reverse-race discrimination. *See Armendariz,* 58 F.3d at 152 (holding that employee's subjective belief that age discrimination occurred is insufficient to create a jury issue). Metro's motion for summary judgment as to this claim will be granted.

## VII. Gender Discrimination Claim

Reno first asserted her gender discrimination claim in her Amended Complaint, filed on April 22, 1996. Metro argues that because this cause of action was brought beyond the ninety day period for timely filing such claims, it is time barred. Reno, on the other hand, contends that her gender discrimination claim arose out of the conduct set forth in her original complaint and under Rule 15(c), the amendment adding this claim

---

1. In reverse discrimination cases in some jurisdictions, courts have required the plaintiff to show, in addition to the traditional McDonnell Douglas elements, "background circumstances" that support the suspicion that the defendant is "that unusual employer who discriminates against the majority." *Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981). However, in this circuit, courts, including the Fifth Circuit, have applied the traditional McDonnell Douglas test without mention of this heightened standard. *See Young,* 906 F.2d at 180; *Ulrich v. Exxon Co.,* 824 F.Supp. 677, 683–84 (S.D.Tex.1993). Absent clear indication from the Fifth Circuit that the heightened standard is to apply, this Court declines to impose upon Reno any additional requirements for establishing a *prima facie* case of reverse race discrimination.

relates back to the date the complaint was filed, January 16, 1996. The Court agrees. Reno alleged in her original complaint that Metro had consistently denied her promotions for discriminatory reasons. Her recently asserted claim that she was not awarded the Inventory Control Technician position because she is female is directly related to the conduct Reno describes in the original, timely filed pleading. As such, the Court will permit the relation back under Rule 15(c) and address the claim on the merits.

■ To establish a *prima facie* case of gender discrimination, the plaintiff must show: (1) she is a member of a protected group; (2) she applied for a position; (3) she was qualified for that position when she applied; (4) she was not selected for that position; and (5) after the defendant declined to hire her the position either remained open or a male was selected to fill it. *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994). Because Reno has not proved that she was qualified to fill the Inventory Control Technician position, she cannot meet her initial burden of establishing a *prima facie* case of gender discrimination. Defendant's motion for summary judgment with respect to this claim will therefore be granted.

## VIII. Retaliation Claim

Reno contends that after filing her internal grievance, Moorer retaliated against her by excluding her from training sessions, by making disparaging comments about her in the presence of other Metro employees, by threatening to force her to complete tasks she was physically incapable of performing and by attempting to reassign her work to other employees in an effort to eliminate her position.

■ To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that she engaged in a statutorily-protected activity; (2) that she experienced an adverse employment action following the protected activity; and (3) that a causal link exists between protected activity and the adverse employment action. *Nowlin,* 33 F.3d at 507; *Hamilton v. Rodgers,* 791 F.2d 439,

441–42 (5th Cir.1986). In addition, the plaintiff must demonstrate that the retaliation was the "but for" cause of her discharge. *McDaniel v. Temple Indep. Sch. Dist.,* 770 F.2d 1340, 1346 (5th Cir.1985). Whether or not there were other reasons for the employer's action, the employee will prevail only by proving that "but for" the protected activity he would not have been subjected to the adverse employment action for which he seeks relief *Jack v. Texaco Research Center,* 743 F.2d 1129, 1131 (5th Cir.1984).

■ None of the conduct in which Reno claims Moorer engaged constitutes an "adverse employment action," such as to permit recovery under Title VII. Title VII was designed to address only ultimate employment decisions and "not every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis,* 77 F.3d at 781–82; *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996) (stating that "not everything that makes an employee unhappy is an actionable adverse action.") " 'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging promoting, and compensating.' " *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (quoting *Dollis,* 77 F.3d at 781–82); see *Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) (stating that an actionable adverse action is one that affects the " 'terms, privileges, duration, or conditions of employment' ") (quoting *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)).

■ The actions of which Reno complains, however, even viewed in the light most favorable to her position, fall well below this standard. For instance, Reno first argues that her exclusion from training sessions should be considered an actionable adverse employment action. In *Dollis v. Rubin,* the Fifth Circuit, when presented with this precise issue, held that an employer's refusal to allow a certain employee to attend training sessions was not conduct that would effect a material adverse change in the terms or conditions of the plaintiff's employment, and thus did not constitute an ultimate

employment decision. 77 F.3d at 779, 782; *see also Bullock v. Widnall,* 953 F.Supp. 1461, 1463 (M.D.Ala.1996) (failure to be selected to attend a training course did not materially alter the terms and conditions of plaintiff's employment and therefore plaintiff could not recover under Title VII for such conduct). "To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future. Such expansion is unwarranted." *Mattern,* 104 F.3d at 708 (emphasis in original).

Similarly, Reno's other asserted incidents of retaliation are equally lacking in consequence. Humiliation experienced by Reno as a result of Moorer's derogatory comments does not constitute an ultimate employment decision. *See Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir.1989) (holding that conduct causing public humiliation was not an actionable adverse employment action because "public perceptions were not a term or condition of employment of [the plaintiff's] employment"). Neither does Moorer's unfulfilled threats to make Reno perform objectionable tasks or Moorer's failed attempt to eliminate Reno's position. *See Southard v. Texas Board of Criminal Justice,* 114 F.3d 539, 555 (5th Cir.1997) ("Undesirable work assignments are not adverse employment actions."); *Mattern,* 104 F.3d at 708 (stating that a verbal threat of being fired, a reprimand for not being at her assigned station, a missed pay increase and being placed on "final warning" before discharge did not constituted adverse employment actions "because of their lack of consequence"). Thus, absent proof of an adverse employment action, Reno cannot sustain her burden of proving a *prima facie* case of retaliation. Therefore, Reno's claim of retaliation is without merit and summary judgment on this claim will be granted in Defendant's favor.

## IX. Section 1983 Claim

▪ To state a claim under § 1983, the plaintiff must allege the following two elements: (1) that she was deprived of a right or interest secured by the Constitution and the laws of the United States, and (2) that the deprivation occurred under color of state law. *Doe v. Rains County Indep. Sch. Dist.,* 66 F.3d 1402, 1406 (5th Cir.1995). Reno contends that as a result of Metro's unlawful conduct, she was deprived of her First Amendment right to free association. Specifically, Reno claims that, due to comments made by Moorer which allegedly ridiculed minority group members, she was unable to exercise her right to freely associate with her African American friends at work. (Pl.'s Resp. Def.'s Mot. for Summ. J., Instr. No. 41 at 18).

The United States Supreme Court has recognized two distinct branches of the constitutional right of free association. The first involves "choices to enter into and maintain certain intimate human relationships" of the type that "must be secured against intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). The second grants "associational rights derivative of the First Amendment rights of speech, assembly, petition for the redress of grievances, and the exercise of religion." *Hobbs v. Hawkins,* 968 F.2d 471, 482 (5th Cir.1992). As Reno has not alleged that Metro or Moorer have prevented her from joining with others in the advocacy of beliefs or from exercising other rights protected by the First Amendment, Reno's claim falls within this first category of constitutionally protected associations.

▪ Friendships, however, such as those allegedly at stake in this case, generally do not form the type of "intimate associations" which are protected by the Constitution. *See Roberts,* 468 U.S. at 620, 104 S.Ct. at 3250 (noting that only certain kinds of highly personal relationships such as marriage and family will fall into this first category); *Copp v. Unified Sch. Dist. No. 501,* 882 F.2d 1547, 1551 (10th Cir.1989) (head custodian's close personal friendship with the high school principal was not "the type of association that the First Amendment shelters from government

action;" generally constitutionally protected relationships "have involved familial settings"). Only if such relationships involve "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life" are they be deserving of protection. *Roberts,* 468 U.S. at 620, 104 S.Ct. at 3250. The relationships falling in this category are distinguished "by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* Clearly, Reno's relationships with her fellow employees do not fit within this description. Therefore, Reno has failed to prove that Moorer's comments deprived her of her First Amendment right of free association.

### 1. Metro's Liability

Even assuming Reno could show a deprivation of a recognizable constitutional right, Reno has not established that Metro should be held liable for Moorer's actions. Local governmental entities, such as Metro, are not vicariously liable for the actions of their employees under § 1983. *Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir.1996). However, such entities can be held liable "for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy." *Palmer v. City of San Antonio, Texas,* 810 F.2d 514, 516 (5th Cir.1987); *see also Monell v. Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). In order to establish liability in these instances, the plaintiff must identify " '(1) a policy (2) of the governmental entity's policymaker (3) that caused (4) the plaintiff to be subjected to a deprivation of constitutional right.' " *Palmer,* 810 F.2d at 516 (quoting *Grandstaff v. City of Borger, Texas,* 767 F.2d 161, 169 (5th Cir.1985)); *see Monell,* 436 U.S. at 690, 98 S.Ct. at 2036 (holding that the claim must be based upon the implementation or execution of "a policy statement, ordinance, regulation,

or decision officially adopted and promulgated by that body's officers"). "Policy" has been defined as a "course of action consciously chosen from among various alternatives." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 828, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

Reno has failed, either in her complaint or in her reply to Metro's motion for summary judgment, to identify a specific policy that caused the constitutional deprivation she claims occurred. Nor does she assert facts which would indicate that Moorer's allegedly improper conduct was expressly or impliedly authorized by Metro's policy makers. Rather, Reno merely states that "Plaintiff's right to freely associate with [her African American friends] is affected when her manager interferes with that right in the work place." (Pl.'s Resp. Def.'s Mot. Summ. J., Instr. No. 41 at 18–19). This bare assertion, however, is unsupported by facts that would connect Moorer's alleged misconduct to Metro policy or that would otherwise support the inference that Metro policy caused Reno to be subjected to a deprivation of her constitutional rights. Thus, absent any indication that Moorer's conduct was pursuant to or in accordance with Metro policy, Reno's unsubstantiated conclusions are insufficient, standing alone, to survive a motion for summary judgment.

### 2. Moorer's and Raymond's Liability

Reno also fails to show why Moorer and Raymond cannot claim qualified immunity to preclude liability for their allegedly unlawful conduct. "Qualified immunity shields state officials, performing discretionary functions, from civil liability for actions which reasonably could have been thought to be consistent with rights allegedly violated." *McGregor v. Louisiana State Univ. Board of Supervisors,* 3 F.3d 850, 862 (5th Cir.1993). In analyzing a qualified immunity claim, the Court must first determine whether plaintiff has " 'allege[d] the violation of a clearly established constitutional right' under currently applicable constitutional standards." *Kelly v. Foti,* 77 F.3d 819, 821 (5th Cir.1996) (quoting *Siegert v. Gilley,* 500 U.S. 226, 231,

111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)); *see also Baker,* 75 F.3d at 198; *Vander Zee v. Reno,* 73 F.3d 1365, 1369 (5th Cir.1996). Thus, the unlawfulness of the government official's conduct must, in light of preexisting law, be readily apparent. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). If the plaintiff fails this step, the defendant is entitled to qualified immunity. *Baker,* 75 F.3d at 198. Otherwise, the Court must consider whether the official's conduct was objectively reasonable in light of judicial precedent at the time of the infraction. *Kelly,* 77 F.3d at 821; *Baker,* 75 F.3d at 198. In making this determination, the Court must look to the established law at the time of the alleged violation. *Kelly,* 77 F.3d at 822.

 The Court finds that Reno has failed to allege the violation of any constitutionally protected interest, much less the violation of a clearly established constitutional right. *See Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793 ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). Under the current state of law, friendships between employees are not, absent proof of special circumstances indicating a greater degree of intimacy than ordinarily expected, relationships entitled to constitutional protection. *See Ortiz v. San Miguel County,* 955 F.Supp. 1338, 1341 (D.N.M.1996) (stating that it is currently "unclear whether friendship can ever be an 'intimate association' protected by the constitution"). Because Reno has not alleged the violation of a clearly established right, Moorer and Raymond are entitled to assert qualified immunity as a defense to Reno's § 1983 claim.

## X. Conclusion

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment.

THIS IS A **FINAL JUDGMENT.**